845 P.2d 158

**Daniel T. YU and Bernice L. Yu, Plaintiffs–Appellees,**

v.

**PAPERCHASE PARTNERSHIP, a general partnership, composed of Robert A. Buel, Victoria Buel, Robert J. Moon, and E. Blanche Moon, Defendants–Appellants.**

**No. 19909.**

Supreme Court of New Mexico.

Nov. 18, 1992.

J.S. Campbell & Associates, John S. Campbell, Albuquerque, for defendants-appellants.

Sylvain Segal, Albuquerque, for plaintiffs-appellees.

## OPINION

MONTGOMERY, Justice.

This is a "vendor and purchaser" case, involving the rights and liabilities, and other legal relations, between two of the parties interested in an installment land sale contract—the original vendor and a subvendee. The vendor is Paperchase Partnership ("Paperchase"); the subvendee is a married couple, Mr. and Mrs. Daniel T. Yu ("the Yus"). These parties, along with others interested in the contract, were before this Court on a previous occasion. In *Paperchase Partnership v. Bruckner*, 102 N.M. 221, 693 P.2d 587 (1985), we held that a subsequent contract between the original vendees, the Bruckners, and a later purchaser, as well as another contract between the later purchaser and the Yus, did not constitute "assignments" in violation of a clause in the original contract prohibiting assignment without the vendor's consent. The issue in the present case is whether the vendor (Paperchase) had the power to terminate the contract and forfeit the subvendee's (the Yus') interest when there was a default in the vendees' obligation to pay the real estate taxes on the property subject to the contract ("the Property") and the vendor did not notify the subvendee of the default or give it an opportunity to cure.

The trial court, in litigation instituted by the Yus to set aside the forfeiture, ruled that the vendor did not have such power under these circumstances and entered summary judgment in favor of the Yus. We agree with this ruling and affirm.

### I.

Paperchase sold the Property to the Bruckners for $180,000 in March 1977, using a standard-form real estate contract containing the following clause:

It is mutually agreed that time is of the essence of this contract. Should the Purchaser fail to make any of the said payments [as required by the contract] ... or fail or refuse to repay any sums advanced by the Owner ... and continue in default for ten (10) [later amended to 15] days after written demand for such payments ... has been mailed to the Purchaser ... at 9108 Hannett N.E., Albuquerque, New Mexico, then the Owner may, at his option, either declare the whole amount remaining unpaid to be then due, and proceed to enforce the payment of the same; or he may terminate this contract and retain all sums theretofore paid hereunder as rental.

In 1979 the Bruckners sold the Property to A & O Investments for an undisclosed amount; in 1980 A & O Investments sold it to the Yus for $230,000; and in 1984 the Yus sold it to Maurice and Clara Strahl for $312,000. All of these sales were accomplished by standard-form real estate contracts, and each subpurchaser except the Strahls assumed the prior contracts and encumbrances.[1] Paperchase was not notified in writing of the sales, nor was its consent obtained. In 1981, however, Daniel Yu telephoned Robert Buel, one of Paperchase's partners, and advised him that he had purchased the Property. After the Yus purchased the Property, they expended more than $200,000 in principal payments and improvements.

In April 1982, Paperchase sued the Bruckners, A & O Investments, and the Yus for a declaratory judgment that Paperchase could either accelerate the balance due on the contract or forfeit the purchasers' interest in the Property. This was the litigation resolved in *Paperchase Partnership v. Bruckner*. Paperchase served the summons in that lawsuit on the Bruckners at their then current address, to which they had moved in December 1977, not at the address on Hannett stipulated in the contract. Additionally, Paperchase attached to its complaint a copy of the Yus' real estate

contract with A & O Investments, which showed the Yus' address.

During the period May 1983 through November 1989, the original contract was in default on eleven different occasions. On each occasion, Paperchase sent a notice of default to the Bruckners' address as listed in the contract (the address on Hannett), not the address to which the Bruckners had moved in December 1977 and at which they had been served with process in April 1982. Paperchase did not send a notice of any of these defaults to either the Yus or the Strahls. Each notice to the Bruckners was returned unclaimed.

On November 3, 1989, Paperchase sent a notice of default to the Bruckners (at the address on Hannett) for failure to provide insurance on the property. On November 9, Mrs. Yu went to the offices of the escrow agent and discussed the insurance policy with someone on the escrow agent's staff. On the same day, Paperchase sent another default notice, to the same address on Hannett, notifying the Bruckners that they were in default for failing to pay the real estate taxes on the Property and that Paperchase had paid the taxes, demanding reimbursement within fifteen days, and threatening to terminate the contract and retain all sums previously paid if reimbursement was not made. No notice of default was sent to the Yus. On November 27, Paperchase elected to forfeit the purchasers' interest in the Property, and on the next day the escrow agent delivered a special warranty deed (restoring legal title in the vendor) and other escrowed documents to Paperchase. On November 29, the escrow agent wrote to the Yus and the Strahls, informing them of the forfeiture and, upon the Yus' inquiry, provided them with copies of the demand notices. At the time of the forfeiture, the unpaid balance on the Paperchase–Bruckner contract was $25,017.45. The estimated value of the Property ranged from less than $100,000 to more than $300,000.

---

1. The Strahls took the property subject to the prior contracts and encumbrances. In the proceeding below, they disclaimed any interest in the Property, so their position in this litigation is not at issue and will not be considered in this opinion.

The Yus brought this action to vacate the forfeiture. After some initial proceedings, the Yus moved for summary judgment, which, as stated above, the trial court granted. Paperchase appeals, insisting that it had no duty to notify the Yus of the default under the contract and that, accordingly, it was free to exercise its right to terminate the contract and forfeit the Bruckners' interests and those of any sub-purchasers, without giving notice to anyone except as specified in its contract.

## II.

Paperchase relies for its position primarily on these statements in *Campbell v. Kerr*, 95 N.M. 73, 618 P.2d 1237 (1980):

> The Samuells–Kerr contract requires demand to be made at a specified address upon Kerr [the vendee]. This was done. *We know of no affirmative duty placed upon a vendor in this situation to attempt to find the vendee, or to contact subpurchasers....* Stepnowski [successor to Samuells, the vendors] fulfilled his obligation under the contract to notify Kerr. If Kerr wished to insure notice, he should have notified his vendor or the escrow agent. Likewise, there is privity of estate, but not privity of contract between a vendor and subpurchasers. *Stepnowski had no legal duty to notify Campbell [a subvendee] of his demand upon Kerr.* A subpurchaser of land from a purchaser with notice of the terms of the contract between the original vendor and the purchaser takes the land subject to such terms. Campbell had notice of the terms of the Samuells–Kerr contract. She could have requested notice in the event of a demand from the vendor. She did not.

*Id.* at 79, 618 P.2d at 1243 (emphasis added; citations omitted).

Paperchase also relies heavily on our statements in the earlier litigation that:

> Even though the vendee has assigned the contract without the vendor's consent, ... if the assignee fully performs the vendee's duties under the contract, the assignee may demand specific performance by the vendor. *But until that time, the vendor is not required to recognize the assignee, nor to rely on him for payment of installments toward the purchase price.*

*Paperchase Partnership v. Bruckner*, 102 N.M. at 223, 693 P.2d at 589 (emphasis added; citations omitted). Noting that we observed that "[t]he district court determined that the Bruckner/A & O and A & O/Yu contracts had no effect on the rights and duties of the parties to the original contract[,]" *id.*, Paperchase contends that *res judicata* (or, presumably, collateral estoppel) precludes the Yus from asserting that Paperchase was required to recognize them for notice purposes or that their interest in the Property had any effect on Paperchase's rights and duties under the contract.

■ Paperchase's contentions concerning the preclusive effect of the prior litigation are easily disposed of. First, the defense of *res judicata* is only available if the previous suit was based on the same cause of action. *Torres v. Village of Capitan*, 92 N.M. 64, 67, 582 P.2d 1277, 1280 (1978). In this case, of course, it was not. The cause of action in the previous litigation was a claim by Paperchase that the vendees' rights could be terminated based on their alleged violation of the prohibition on assignment; the cause of action in the present case is the Yus' claim that the contract should be reinstated because of Paperchase's failure to notify them of a claimed default in payment of real estate taxes.

With respect to collateral estoppel, the doctrine requires identity of issues in the prior litigation and in the current lawsuit. *City of Santa Fe v. Velarde*, 90 N.M. 444, 446, 564 P.2d 1326, 1328 (1977). As Paperchase admits in its reply brief, "The question before the Court in the instant case is certainly different from the question before the Court in [*Bruckner*], for that case did not deal with notice and notice requirements." The dictum in *Bruckner* that the vendor is not required to recognize the assignee (or the subvendee), nor to rely on him for payment of installments toward the purchase price (or payment of taxes), was

uttered in the context of determining whether a subsequent purchase-and-sale contract constituted a prohibited assignment. It was not made in the context of defining the vendor's duty to give a subvendee notice of a default or determining whether a vendor has the power to declare a forfeiture when a subvendee, without notice of a default, fails to cure.

A somewhat more difficult question is presented by Paperchase's heavy reliance on the statements in *Campbell v. Kerr* that a vendor has no legal duty to notify a subvendee of a demand on the vendee and that there is no affirmative duty on a vendor to attempt to find the vendee or to contact subpurchasers. Indeed, Paperchase strenuously argues that a ruling in the Yus' favor will require us to overrule *Campbell.* We think, however, that the broad statements in *Campbell* do not require this result and do not extend as far as Paperchase would like.

For one thing, *Campbell* has been modified by the subsequent case of *Martinez v. Logsdon,* 104 N.M. 479, 723 P.2d 248 (1986). In that case, as in this one, the plaintiffs were subvendees under an installment land sale agreement and were awarded a summary judgment, which we sustained, in their suit against the original vendor. The vendor sent a demand to the original vendees, advising them of their delinquency on the payments due under the contract and of his intent to forfeit the contract if the payments were not made. The escrow agent sent a copy of the notice to the plaintiffs' predecessor, who had purchased from the original vendee and resold to the plaintiffs, but not to the plaintiffs themselves, although the vendor was aware that the plaintiffs had an interest in the land. When the default was not cured, the vendor declared a forfeiture and demanded that the plaintiffs vacate the premises. The plaintiffs refused and filed suit against the vendor for specific performance of the contract.

As in the present case, the vendor argued that he had not "wronged" the plaintiffs; he was not in privity of contract with

them and therefore not obligated to notify them of any default under the original contract. 104 N.M. at 481, 723 P.2d at 250. Citing *Campbell v. Kerr,* the vendor also argued that even if he knew plaintiffs resided on the premises, they, as subpurchasers, were not entitled to notice of the demand for payment. *Id.* Finally, the vendor maintained, just as Paperchase does in the instant case, that his knowledge, before declaring forfeiture, that plaintiffs had some interest in the property was irrelevant. *Id.*

We responded: "We disagree. The court correctly considered whether defendant had notice of plaintiffs' claim to the property." *Id.* After reviewing various equitable considerations in plaintiffs' favor, we concluded that summary judgment was proper

> because the equitable circumstances surrounding this case *precluded defendant from exercising his right to terminate the contract....*
>
> ... Under these circumstances, *to permit defendant to terminate the contract,* gain title to the property, and retain all payments made, would result in an "unfairness which shocks the conscience of the court."

*Id.* at 482, 723 P.2d at 251 (emphasis added) (quoting *Eiferle v. Toppino,* 90 N.M. 469, 470, 565 P.2d 340, 341 (1977)).

Our approach in *Logsdon*—or at least our language, as emphasized in the foregoing quotation—suggests a second reason why the sweeping statements in *Campbell* about the existence or nonexistence of a duty on the part of the vendor toward a subvendee are inapplicable in this case. On the surface it may appear that this case involves the question whether the vendor (Paperchase) was guilty of a breach of duty to notify the subvendee (the Yus) of the default under the contract and of the impending forfeiture. But the Yus are not suing Paperchase for damages for breach of a legal duty to themselves or even, as in *Logsdon,* for specific performance to enforce such a duty.[2] Thus, on closer analy-

---

2. Nor have the Yus alleged that Paperchase was guilty of "misconduct" toward them, providing

sis one sees that what is really involved in this case is whether Paperchase can exercise its power under the contract to declare a forfeiture—whether, in the language of *Logsdon*, the vendor will be precluded from exercising its right to terminate the contract. To understand this line of analysis, it is necessary, or at least helpful, to indulge in a short digression into the so-called "Hohfeldian" approach to the rights and duties, and other legal relationships, between or among the parties to a transaction.

### III.

In 1913, Professor Wesley N. Hohfeld published in the *Yale Law Journal* his famous article, *Some Fundamental Legal Conceptions as Applied in Judicial Reasoning*, 23 Yale L.J. 16 (1913). The article provoked a firestorm of scholarly debate, which has continued to recent times,[3] concerning the nature of and distinctions among various legal concepts, and the terms used to denote them, relating generally to notions of legal "rights" and corresponding "duties." Hohfeldian analysis occasionally appears in judicial decisions (of-

ten in footnotes),[4] although for the most part—perhaps because the nuances of meaning and shades of distinction are just too elusive to be easily grasped—reliance on Professor Hohfeld's terminology and conceptual relationships is not widespread in judicial opinions.

As Professor Hohfeld said,

> One of the greatest hindrances to the clear understanding, the incisive statement, and the true solution of legal problems frequently arises from the express or tacit assumption that all legal relations may be reduced to "rights" and "duties," and that these latter categories are therefore adequate for the purpose of analyzing even the most complex legal interests....

Hohfeld, *supra*, at 28. To facilitate what he called a more "discriminating" analysis, Professor Hohfeld classified all fundamental legal relations into eight categories of "jural opposites" and "jural correlatives." He employed the following terms to denote these fundamental relations, and arranged them in the following two tables to display their interrelationships:

---

the basis for an estoppel, as the subvendee alleged in *Campbell v. Kerr.* 95 N.M. at 78–79, 618 P.2d at 1242–43. In order to find misconduct on the part of the vendor in *Campbell*, it was (presumably) necessary to find a breach of duty by the vendor toward the vendee and the subvendees. It was in this context that this Court ruled that there was no affirmative duty upon a vendor to attempt to find the vendee or to contact subpurchasers. We neither reaffirm nor repudiate this proposition in the present case. We simply hold that (as we shall explain in the remainder of this opinion), regardless of whether Paperchase was or was not under a legal duty to notify the Yus of the default in payment of taxes, Paperchase was under a legal disability, in the circumstances of this case, to forfeit the Yus' interest in the Property.

3. *See generally* Joseph W. Singer, *The Legal Rights Debate in Analytical Jurisprudence From Bentham to Hohfeld*, 1982 Wis.L.Rev. 975. For citations to the voluminous literature concerning the "legal rights debate" centering around, or at least involving, Professor Hohfeld's article, *see id.* at 989 n. 22. For a very recent application of Hohfeldian analysis to various property-law concepts, *see* John S. Harbison, *Hohfeld and*

*Herefords: The Concept of Property and the Law of the Range*, 22 N.M.L.Rev. 459, 475–81 (1992).

4. *See, e.g., Sims v. Century Kiest Apartments*, 567 S.W.2d 526, 531–32 & n. 2 (Tex.Civ.App. 1978) (distinguishing between a landlord's "power" to terminate a tenancy and his "right" to do so, in deciding whether to recognize a cause of action for damages for retaliatory eviction); *Fernandez v. Linea Aeropostal Venezolana*, 156 F.Supp. 94, 97 (S.D.N.Y.1957) (distinguishing between a "right" and a "power," which removes a previous "disability," to maintain a wrongful death action for a death occurring at sea); *Zablocki v. Redhail*, 434 U.S. 374, 392, 98 S.Ct. 673, 684, 54 L.Ed.2d 618 (1978) (concurring opinion of Powell, J.) (distinguishing between "right" and "privilege" to marry for constitutional purposes); *Gutierrez v. Vergari*, 499 F.Supp. 1040, 1048 n. 6 (S.D.N.Y.1980) (distinguishing between rights and duties, on one hand, and powers and liabilities, on other hand, for purposes of 42 U.S.C. § 1983); *Seattle Sch. Dist. No. 1 v. State*, 90 Wash.2d 476, 585 P.2d 71, 91 & n. 10 (1978) (en banc) (holding that constitutionally imposed "duty" of state to provide for children's education entails children's correlative "right" to receive education).

### Jural Opposites

| | | | |
|---|---|---|---|
| right | privilege | power | immunity |
| no-right | duty | disability | liability |

### Jural Correlatives

| | | | |
|---|---|---|---|
| right | privilege | power | immunity |
| duty | no-right | liability | disability· |

---

*Id.* at 30.

The phrase "jural opposite," as Hohfeld used it, means that one of the eight terms (or "conceptions") entails the absence or "negation" of its opposite. Thus, the term "privilege" is the negation of the term "duty." *Id.* at 32–33. For example, one who has a privilege to enter upon another's land does not have a duty to remain off the land.

"The concept of 'correlatives' is harder to grasp." Singer, *supra* note 2, at 987. Two "[c]orrelatives express a single legal relation from the point of view of the two parties." *Id.* The familiar example of this relationship is the right-duty set of correlatives: If one party has a duty to perform an act, the other party has a correlative right that the act shall be performed. Hohfeld, *supra*, at 31–32.

In the context of the present case, and focusing on the legal conception or term applicable to Paperchase, it is relatively easy to see that the applicable concept is not "duty," but "disability." Hohfeld describes "legal power" as the opposite of "legal disability" and gives as the nearest synonym for a legal power the term legal "ability," the opposite of which is "inability" or "disability." *Id.* at 44–45. A legal "power" is described as the ability to alter a given legal relation. *Id.* at 44.

Thus, although many might say (loosely, as Hohfeld would have it) that Paperchase had the *right* to terminate its contract with the Bruckners upon their nonpayment of taxes, Hohfeld would (probably) have said that Paperchase had the *power* to do so, for no one was under a correlative *duty* to surrender title to the Property when the taxes were not paid. Rather, it is (probably) more accurate to say, in Hohfeldian terms, that Paperchase had the power to terminate the Bruckners' (and all subvendees') interest in the Property upon giving notice, making proper demand, and affording the requisite opportunity to cure the default.

The opposite of Paperchase's power part to terminate the vendees' (including the Yus') interest in the Property is a legal disability to terminate that interest in the event that certain conditions were not met. The question in this case is: Was one of those conditions the necessity to notify the Yus of the default in paying the taxes, when Paperchase had knowledge of the Yus' interest in the Property and could have (but did not) given them notice and an opportunity to cure the default? We shall return to this question in Part IV below.

The purpose of the foregoing excursion into Hohfeldian analysis is not to suggest that the solution to a legal problem appears, almost automatically, when one employs the right terminology. On the contrary, use of these terms, no matter how careful and discriminating one may be in their selection and application, probably does little more than describe the result of the court's analysis of the problem and the solution it reaches; the solution does not spring, magically, from the correct selection of the proper "jural conception." At the same time, Hohfeldian analysis has this one (perhaps among others) considerable virtue: It requires, or at least counsels, the legal advocate or jurist to be exceedingly careful ("discriminating," to use Hohfeld's word) in using terms like "right," "duty," "privilege," "liability," and the others. In the present case, Paperchase can be said to be guilty of using the term "duty" in a loose sense (understandably, in view of *Campbell v. Kerr*); but its (and *Campbell's*) loose use of that term does not

mean that Paperchase is, as it argues, entitled inexorably to prevail on this appeal.

## IV.

We return, then, to the question whether a vendor with knowledge of its subvendee's interest in the land, who does not give the subvendee notice of an impending forfeiture, has the legal ability—the power—to terminate the subvendee's interest. Stated otherwise, the question is whether the vendor in this situation is under a legal disability from terminating its subvendee's interest in the land. We have already seen that this Court in *Logsdon* held that the vendor was precluded—*i.e.*, did not have the ability or the power—to terminate its subvendee's interest. Is this legal principle shared by the decisions of other courts around the country; and, if so, what is the underlying reason for the principle?

There are occasional statements consistent with *Campbell*, appearing in cases and in secondary authorities, that a subvendee is not entitled to notice of default when the original purchaser defaults on the contract with the vendor. *See, e.g., Porter v. Barrett,* 233 Mich. 373, 206 N.W. 532, 533 (1925) ("Plaintiffs had no contract relations with defendant Robinson [a subvendee]. He was a stranger to them and their contract. Under such circumstances he was not entitled to notice of the forfeiture of a contract to which he was not a party."); Walter H.E. Jaeger, *Williston on Contracts* § 927A, at 829–30 (3d ed. 1963) ("Where a purchaser enters into a subcontract and afterwards defaults on his obligations to the original vendor, the latter can foreclose [*i.e.*, forfeit] the contract without notice to the subpurchaser though the fact of the subpurchase is known."). It appears, however, that such statements are based on older authorities and may not take into consideration the numerous factors, many equitable in nature, through which the trend in the law has come to favor the rights of a subpurchaser where the subpurchaser has a significant equity in the property and the original vendor has notice or knowledge of the subpurchaser's interest. This trend is illustrated by the

more modern case of *Sofie v. Kane,* 32 Wash.App. 889, 650 P.2d 1124 (1982), in which the court said: "In order to terminate or cancel their contract, both Kane and the Robins [the vendor and the vendee] were required to give notice to subsequent vendees of whom they had actual knowledge." *Id.* 650 P.2d at 1128 (citing *Kendrick v. Davis,* 75 Wash.2d 456, 452 P.2d 222 (1969) (en banc), and *Welling v. Mount Si Bowl, Inc.,* 79 Wash.2d 485, 487 P.2d 620 (1971)).

Other cases, which we deem sufficiently analogous to be persuasive in this context, are those in which a vendor's failure to give notice to a vendee's assignee or mortgagee has been held ineffective to divest the assignee or mortgagee of its interest in the property. Two cases recognizing the rights of the assignee are *Roberts v. Morin,* 198 Mont. 233, 645 P.2d 423 (1982), and *Hadlock v. Showcase Real Estate, Inc.,* 680 P.2d 395 (Utah 1984). In *Roberts,* the contract provided that notice of default be sent to the "buyer" at a certain address. The court said:

> Morin interpreted this to mean that notice of default had to be sent only to the address of the "buyer" named in the original contract, regardless of the assignments. The problem with this type of notice is that it fails in this situation to take into account the Robertses [the assignees'] interest in the property.

*Roberts,* 645 P.2d at 425.

In *Hadlock,* a defendant, Myers, was a remote assignee of a real estate contract between the plaintiffs and the original purchaser. When several monthly installments and property taxes became delinquent, the plaintiffs notified the original purchaser and all assignees that the delinquent amount had to be paid within the period stipulated in the contract or the contract would be terminated. The notice was sent to Myers at an incorrect address. When the notice was returned unclaimed, no attempt was made to notify Myers at his correct address, although the plaintiffs had learned it during the course of a title search preparatory to attempting to termi-

nate the buyers' interest in the contract. The court held

> that inasmuch as his [Myers's] correct address was on the recorded instrument which gave the plaintiffs notice of his interest, plaintiffs should have attempted to notify him at that address. This is not to suggest that where a seller has no notice of an assignment or lacks an address where a notice may be mailed to an assignee, ... the seller can be thwarted in obtaining the remedies afforded him by the contract. That, however, is not the situation here.
>
> ... [U]ntil an appropriate notice and demand has been given [the assignee] in accordance with [the contract], the plaintiffs, as sellers, have no cause of action under that instrument to terminate his interest.

*Hadlock*, 680 P.2d at 397–98. It will be noted that the effect of this ruling was to place the vendors under a legal disability ("have no cause of action") to terminate the assignee's interest.

Similarly, a number of modern cases hold that a mortgagee of a contract purchaser's equitable interest in the land subject to the contract is entitled to notice of a default and an opportunity to cure before the mortgagee will lose its interest. *See, e.g., Lockhart Co. v. B.F.K., Ltd.*, 107 Idaho 633, 691 P.2d 1248, 1250 (1984) ("We hold that the sellers, if notified of the assignment, owed the lender a parallel duty to provide notice of a default." (relying in part on *Shindledecker v. Savage*, 96 N.M. 42, 627 P.2d 1241 (1981))); *Knauss v. Miles Homes, Inc.*, 173 N.W.2d 896, 900 (N.D.1969) (where vendor knew purchaser's interest had been mortgaged, mortgagee should have been joined in action to cancel contract); *Chambers v. Cranston*, 16 Wash. App. 543, 558 P.2d 271, 273 (1976) ("If the purchaser has mortgaged his interest, the mortgagee is entitled to notice of forfeiture if the seller knows of the mortgagee, and the mortgagee has the right to tender payments to the seller necessary to protect his security, *i.e.*, to keep the contract in effect."). *See also* Milton R. Friedman, *Contracts and Conveyances of Real Property* § 2.1, at 193 (5th ed. 1991) ("Seller is re-

quired to give the mortgagee notice of any intention to forfeit the contract, but only if he has knowledge of the mortgage."); Richard R. Powell, *Powell on Real Property* ¶ 938.26[2] (Patrick J. Rohan ed., 1992 rev.) ("Nearly all courts now hold that notice is required when the vendor has actual or constructive notice of the [vendee's] mortgage.").

Many of these cases rely, at least in part, on equitable considerations, as we have seen this Court did in *Logsdon*. These considerations provide the key to an understanding of the reason for the rule we adopt today—that a vendor with knowledge of a subvendee's interest in property subject to a real estate contract, where the subvendee has a significant equity in the property subject to the contract, cannot declare a forfeiture of the subvendee's interest without giving the subvendee notice of default and an opportunity to cure. That reason is simply " 'the modern view that valuable contractual rights should not be surrendered or forfeitures suffered by a slight delay in performance unless such intention clearly appears from the contract or where specific enforcement [upon the seller] will work injustice after a delayed tender.' " *Martinez v. Martinez*, 101 N.M. 88, 91–92, 678 P.2d 1163, 1165–66 (1984) (quoting *Katemis v. Westerlind*, 120 Cal. App.2d 537, 261 P.2d 553, 558 (1953) (alteration in original)). As we observed in *Martinez*, the courts' disapproval of forfeitures is longstanding; "we are not compelled in every case to enforce a real estate contract when fairness and legal principles dictate that we should not." *Id.* 101 N.M. at 92, 678 P.2d at 1167. A forfeiture declaration is essentially an equitable remedy. *See Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 102, 654 P.2d 548, 555 (1982) (court makes determination whether forfeiture should be allowed based on existing facts and equitable factors). It therefore makes perfectly good sense to apply equitable principles in determining whether a vendor under an installment land sale contract will be permitted to declare a forfeiture.

In *Logsdon,* 104 N.M. at 482, 723 P.2d at 251, we summarized some of the considerations in determining whether to relieve a forfeiture. Without repeating all of those considerations, we note that they include the amount of money already paid by the purchaser and the market value of the property at the time of default compared to the original sales price. Paperchase argues that equitable considerations should not be applied in this case because issues of fact prevent a summary judgment. The only question of fact Paperchase identifies, however, is the value of the Property; Paperchase estimates it as less than $100,000 at the time of the default, whereas the Yus' estimate is in excess of $300,000. Under the other undisputed facts in the case, we deem this dispute immaterial.

It is undisputed that Paperchase sold the property in 1977 for $180,000 and at the time of the default was owed about $25,000 on the contract. It is undisputed that the Yus bought the Property in 1980 for $230,000; that they made principal payments on their contract and improvements to the Property totalling approximately $200,000; and that they sold the Property in 1984 for $312,000. It is undisputed that Paperchase did not notify the Yus of the default in payment of taxes in November 1989, even though it had known of their interest since 1981 and had known their address since at least 1982. It is undisputed that the escrow agent (Paperchase's agent for this purpose, *see In re Mancha,* 35 B.R. 427, 429 (9th Cir. BAP 1983)), knew the Yus' address at the time of the default but did not provide them with a copy of the default notice until after the forfeiture had been effected and the escrowed documents had been returned to Paperchase. And finally, it is undisputed that Paperchase followed a systematic program of sending default notices to an address where it knew the notices would not reach anyone interested in the Property—not even the Bruckners, the purchasers under the original contract. So studied was Paperchase's adherence to the literal, but by then largely ineffectual, notice provision of the original contract that it says in its brief (in a remark that can only be described as reveal-ing a penchant for understatement): "Moreover, the prior litigation could have only put the Yus on notice that Paperchase Partnership had a penchant for strictly enforcing the Paperchase Real Estate Contract."

"Under these circumstances, to permit defendant to terminate the contract, gain title to the property, and retain all payments made, would result in an 'unfairness which shocks the conscience of the court.'" *Logsdon,* 104 N.M. at 482, 723 P.2d at 251 (quoting *Eiferle v. Toppino,* 90 N.M. 469, 470, 565 P.2d 340, 341 (1977)). The trial court in the present case so held, and its judgment is

Affirmed.

IT IS SO ORDERED.

RANSOM, C.J., concurs.

FROST, J., specially concurring.

FROST, Justice (specially concurring).

I concur in the foregoing opinion, except those portions which discuss and seemingly endorse Hohfeld's analysis of legal relationships. This discussion is unnecessary. A consideration of Mr. Hohfeld's analytical system should be left to law students and their professors where the views of Messrs. Austin, Bentham and John Stuart Mill could be given their due.