928 P.2d 947

**WINROCK INN COMPANY, a New Mexico Limited Partnership, Plaintiff–Appellee/Cross–Appellant,**

**v.**

**The PRUDENTIAL INSURANCE COMPANY OF AMERICA, a New Jersey corporation; and Terranomics Retail Services, a New Mexico corporation, Defendants–Appellants/Cross–Appellees.**

No. 16325.

Court of Appeals of New Mexico.

Sept. 17, 1996.

Certiorari Denied Nov. 25, 1996.

Catherine F. Davis, Julie J. Vargas, Hunt, Reecer & Davis, P.C., Albuquerque, for Appellee/Cross–Appellant.

Norman S. Thayer, Michael J. Cadigan, Andrew J. Simons, Sutin, Thayer & Browne, P.C., Albuquerque, for Appellants/Cross–Appellees.

## OPINION

PICKARD, Judge.

1. We take the opportunity presented by this case to examine New Mexico law regarding implied easements and forfeiture of leasehold interests. Defendant–Appellants/Cross–Appellees, The Prudential Insurance Company and its agent and property manager, Terranomics Retail Services (collectively "Prudential"), own the Winrock Mall (the Mall) in Albuquerque. Plaintiff–Appellee/Cross–Appellant, the Winrock Inn (Winrock), is a tenant of the Mall. Litigation between the parties in district court ended in a decision by the district court which granted some relief to each party. Neither party was satisfied by the judgment. Prudential appealed and Winrock cross-appealed. We reverse and remand for further proceedings.

## FACTS

2. Winrock has been a tenant of the Mall since 1961. It has lease options extending to the year 2059. Prudential purchased the Mall in 1979. Under an amended lease agreement signed in 1987, Winrock leased space for a lobby and meeting rooms (the lobby lease) on property subjacent to the Mall. The hotel rooms are covered by a separate lease (the ground lease) and are located in a separate building from the lobby. The ground lease has an express covenant for quiet enjoyment. The lobby lease does not. This case concerns only the lobby lease as amended in 1987.

3. The lease agreement between Prudential and Winrock was an arms-length transaction between parties of relatively equal bargaining power. As part of the lease agreement, Winrock was to pay common area maintenance (CAM) charges, proportionate insurance, and ad valorem taxes to Prudential in addition to and as part of its rent. The amount was to be determined on a monthly basis by Prudential. The CAM charges were intended to reimburse Prudential for expenditures associated with administering, maintaining, and operating those areas in the Mall that were accessible to and used by all Mall patrons. The lease specified that these common areas could be "expanded, contracted or changed by [Prudential] ... as required, or deemed desirable." The lease further stated that any exercise by Prudential of its rights under the lease would not constitute an eviction or disturbance of Winrock's use of the leased premises.

4. In the lease, the parties agreed to subject any dispute to binding arbitration. Winrock was to pay the full amount of rent owed each month with no set-off. Upon a default in payment of rent, Prudential could elect, after giving Winrock an opportunity to cure, to terminate the lease and evict Winrock from the premises. Winrock agreed to peaceably surrender the premises upon termination of the lease.

5. The main entrance to Winrock's hotel lobby was through doors leading south out of the lobby toward the ground lease (the south entrance). Guests were directed to this entrance by signs. To the north of the lobby was a courtyard, accessible from the lobby through glass doors (the north entrance). A flight of stairs led from the courtyard to the west entrance of the Mall. The courtyard was not leased by Winrock, nor did Winrock have exclusive use of the courtyard.

6. Prior to the amendment of the lease, the north end of the lobby was subdivided and leased by various small businesses which provided services and operated retail shops in the lobby area. Winrock presented testimony at trial that the attractiveness and convenience of the courtyard were a major reason why Winrock decided to amend the lobby lease in 1987 to lease the entire lobby

area. Winrock also presented testimony that, in reliance on the access to the Mall through the north doors, Winrock undertook a lobby renovation project which cost approximately $800,000. Winrock conceded at trial that Prudential never represented to Winrock that the courtyard was permanent.

7. In 1990, Winrock noticed that the CAM charges had begun to escalate steeply. The timing of the escalation in charges roughly coincided with the loss of the J.C. Penney department store, which had been the "anchor tenant" at the west end of the Mall. Winrock wrote to Prudential twice, requesting a decrease in the CAM charges, and also requested that Winrock be excused from participation in the Merchant's Association. Prudential declined to decrease the CAM amounts.

8. On April 1, 1991, Winrock stopped paying CAM charges, and on May 31, 1991, it requested an explanation of the CAM charges over the previous ten years. Prudential responded that it was unable to find records dated before 1987, but was forwarding invoices as available. Winrock took action in stopping payment of CAM charges unilaterally, without the permission or approval of a court or arbitrator. Winrock did not pay the undisputed portion of the CAM charges, nor did it put any amount of the CAM charges into an escrow account or court registry. In July 1991, Prudential notified Winrock that the failure to pay the CAM charges was a default under the lease. Winrock did not cure the default. In August and September 1991, Winrock failed to pay the ad valorem taxes or trash removal charges, and it continued to withhold the CAM charges. In August 1991, Winrock filed an arbitration action against Prudential over the disputed CAM charges. In October 1991, Prudential notified Winrock that it was exercising its option to terminate the lobby lease because of Winrock's uncured default of CAM payments. Prudential requested that Winrock peaceably surrender the premises as mandated by the lease agreement. Winrock did not vacate the lobby. In November 1991, Prudential refused payment of rent on the lobby lease. Prudential subsequently requested a separate check for payment of the

ground lease rent. In March 1992, Winrock set up an escrow account and began to deposit the rent amounts for the lobby lease in that account.

9. Matters proceeded in this manner for some time. Winrock did not vacate the lobby, and Prudential did not take action to have Winrock evicted. Some time after terminating the lease, Prudential notified Winrock that the CAM charges were being raised again. Winrock did not pay the increased amount. Winrock continued to withhold all CAM charges and to place the rent for the lobby lease in escrow.

10. Then, in January 1993, Prudential began a major renovation project (the project) on the west entrance of the Mall to accommodate Dillard's department store, which was to be the new anchor tenant in the space vacated by J.C. Penney. Though the project had been discussed in meetings with tenants of the Mall, Winrock was not shown plans for the specific changes to be made. The project called for the courtyard outside the lobby area to be eliminated, blocking that route to the Mall and the natural light which had filtered in through the windows and glass doors. The south entrance to the lobby was unaffected by Prudential's reconfiguration of the west end of the Mall.

11. Winrock filed suit in the district court for a preliminary injunction in February 1993 to stop the remodeling project. The injunction requested that the judge issue a declaratory judgment stating that Winrock had easements for natural light and access through the courtyard. Prudential claimed that Winrock was not entitled to injunctive relief because the lobby lease had been terminated in October 1991. Prudential counterclaimed to have Winrock evicted.

12. In February and April 1993, Winrock filed amended applications for injunctive relief, seeking to add claims for breach of contract and to add all tenants at the Mall as potential claimants. Pursuant to Prudential's motion, the district court dismissed the new claims and indicated that the issues to be decided in the preliminary injunction hearing would be "limited to the injunction issues and defenses thereto, and the declaratory judgment issues and eviction issues

framed by the counterclaim, and defenses thereto."

13. In July 1993, Winrock filed a third amended application for preliminary and permanent injunctive relief and for a declaratory judgment that Winrock had an implied easement for access to the Mall via the north doors. Winrock also wanted the district court to issue a declaratory judgment that fourteen specific types of CAM charges were unreasonable, breached the lease, or were improperly calculated. Winrock defended against the eviction saying that it would be unconscionable to evict Winrock without permitting it to cure any default. Finally, Winrock sought punitive damages for fraud.

14. Prudential defended against the injunction and pressed for Winrock's eviction from the lobby. Prudential maintained that it had no duty to inform Winrock of the effect of the project on the courtyard since Winrock was wrongfully holding over after termination of the lobby lease. Prudential continued to argue that Winrock should be compelled to pay past-due rent and all past-due CAM charges owed under the lease. During the injunction proceedings, Prudential proceeded with construction on the project.

15. The district court held a bench trial in August 1993. Each side introduced voluminous evidence in support of its claims. The district court found that Winrock had implied easements for access through the courtyard and for natural light through windows on the courtyard. The court found that Prudential committed a material breach of the lease by concealing its plans to eliminate the courtyard from Winrock. The court found that Prudential breached the implied covenant of quiet enjoyment, breached the lease, and irreparably harmed Winrock by filling the courtyard, thereby blocking Winrock's access and natural light. Winrock was determined to have withheld the CAM charges in breach of the lease, which breach was not excused or cured. Nevertheless, the court found that it would be inequitable and unconscionable to evict Winrock because Prudential breached the lease first and because the leased premises would not be usable for anything but

storage and would be of little financial benefit to Prudential while Winrock would suffer a very substantial loss from the eviction.

16. The district court also ruled on the propriety of certain specifically challenged CAM charges. We discuss the issues relating to these specific complaints below only to the extent that the district court's decision on these issues impacts the analysis of the issues we otherwise discuss. The court declared that Prudential would forfeit the amount it had billed Winrock for insurance from the date that Winrock first questioned the propriety of the insurance charges until such time as Prudential provided an adequate accounting of the insurance charges to Winrock. The court based the forfeiture decision on its finding that Prudential had breached its fiduciary duty to Winrock by failing to provide an adequate accounting of the basis for the insurance charges. Finally, the court found that all parties had unclean hands. Other claims were also litigated and decided, but in light of our decision, we deem it unnecessary to discuss them in detail.

## ANALYSIS

### Implied Easements For Access and Natural Light

17. Prudential argues that the district court erred in finding that Winrock had implied easements for access to the Mall through the courtyard and for natural light from the courtyard. Citing *Smith v. Price's Creameries*, 98 N.M. 541, 650 P.2d 825 (1982), Prudential asserts that the district court had no authority to modify the lease by reading the implied easements into the lease. *See id.* at 545, 650 P.2d at 829. Under the circumstances of this case, we agree.

18. Our Supreme Court has stated that when an implied term conflicts with the express terms of a contract, the implied term must fail. *Continental Potash, Inc. v. Freeport–McMoran, Inc.*, 115 N.M. 690, 704–05, 707, 858 P.2d 66, 80–81, 83 (1993), *cert. denied*, 510 U.S. 1116, 114 S.Ct. 1064, 127 L.Ed.2d 383 (1994). The lease between Prudential and Winrock expressly reserved to the landlord the right to expand, contract, or change the common area. Implied easements of access and natural light would be in

direct conflict with the specific terms of the contract.

19. An easement for ingress and egress has been found by implication when the easement is one of reasonable necessity, as in otherwise landlocked property, *Herrera v. Roman Catholic Church*, 112 N.M. 717, 720, 819 P.2d 264, 267 (Ct.App.1991), or when there is no reasonable way to use the property without the easement, *Venegas v. Luby*, 49 N.M. 381, 387, 164 P.2d 584, 588 (1945). However, in this case, the north entrance was not the only access to the lobby, nor even the principal one. The main entrance to the Winrock lobby has always been through the south entrance. Thus, access through the north entrance is not warranted either by reasonable necessity or for reasonable use.

20. Winrock cites our Supreme Court's holding in *Wal–Go Associates v. Leon*, 95 N.M. 565, 624 P.2d 507 (1981), in support of its argument for an implied easement for access. In *Wal–Go*, the tenant leased property in a shopping center for a convenience store and placed gas pumps on adjoining property which he owned. *Id.* at 566, 624 P.2d at 508. Customers crossed a common parking lot to pay for the gas in the convenience store. *Id.* at 567, 624 P.2d at 509. During a dispute with the tenant, the landlord built a fence across the common parking lot between the convenience store and the gas pumps. The fence interfered with customer access. *Id.* The Supreme Court held that building the fence breached the lease. *Id.* at 569, 624 P.2d at 511. However, the landlord in *Wal–Go* did not expressly reserve a unilateral right to modify the common areas as did Prudential in this case. Further, the fence in *Wal–Go* interfered unreasonably with customer access which was not the case with Winrock. *See id.* at 567, 624 P.2d at 509.

21. Two out-of-state cases relied upon by Winrock merit discussion with respect to its claim that it had an implied easement over the courtyard. In *Owsley v. Hamner*, 36 Cal.2d 710, 227 P.2d 263 (1951) (en banc), the California Supreme Court enjoined the landlord from altering a patio adjacent to the tenant's premises. The *Owsley* court found

that the use of the patio, although not discussed in the lease, was reasonably necessary to the beneficial enjoyment of the lease. *Id.* 227 P.2d at 268. Because the lease had not reserved to the landlord the right to modify the area, the patio would pass as an incident to the lease. *Id.*

22. In *Hamilton v. Graybill,* 19 Misc. 521, 43 N.Y.S. 1079 (App.Term 1897), the issue was the tenant's right of access to a common hallway from two outer doors from his office. The landlord had blocked one of the doors to build an office for another tenant. The court determined that the separate entrances were integral appurtenances to the premises and necessary to the full use of the office space. *Id.* 43 N.Y.S. at 1080–81. The court affirmed the lower court's determination that the tenant had been evicted from part of the leased space.

■ 23. Neither of these cases helps Winrock. In *Owsley,* unlike this case, the landlord had not reserved the right to modify the common areas of the building. Unlike the tenant in *Hamilton,* Winrock had notice that the courtyard was not an integral appurtenance to the lobby lease. As we have noted, when a contract speaks to the obligation sought to be implied, courts will not write an implied obligation into the contract. *See Continental Potash,* 115 N.M. at 704, 858 P.2d at 80. Because the express terms of the lease agreement between Winrock and Prudential reserved to Prudential the right to modify the courtyard, we reverse the district court's finding that Winrock had an implied easement for access through the courtyard.

■ 24. Winrock's argument that it had an implied easement for natural light arises from and is bound up with its claim of an easement for access through the glass doors of the north entrance. Winrock does not cite any cases for the proposition that an implied easement for natural light exists in this country. At English common law, an easement for natural light could be implied. *See* G.R.B., Annotation, *Rule of Visible Easements as Applied to Easement of Light or Air,* 56 A.L.R. 1138, 1138–39 (1928). However, American cases tend to follow the rule that no easement of light can be acquired

without express grant. *Id.* at 1142, 1147. Because Winrock does not claim an independent easement for natural light, but rather argues for that easement as an incident of the easement for access, this claim must fail for the reasons given above.

### Covenant of Good Faith and Fair Dealing

#### Reliance

25. Winrock contends that it relied on the continuing presence of the courtyard in renegotiating the lease terms in 1987 to lease the whole lobby space. Winrock presented testimony that it would not have leased the whole lobby space had it not been for the access and light from the courtyard. Winrock further submitted that, in reliance on the existence of the courtyard, it spent approximately $800,000 to renovate and remodel the lobby area in 1989. The period during which Winrock was remodelling the lobby overlaps Prudential's initial planning stage for a reconfiguration of the west entrance of the Mall. The district court determined that Winrock's reliance on the continued existence of the courtyard was reasonable, and that the right of Prudential to make whatever changes it deemed necessary was not superior to Winrock's right of access through the courtyard. To the extent that Winrock may have a claim against Prudential for all or a part of the $800,000 it spent in renovations, no such claim was litigated below, and we do not discuss it further.

#### Duty to Give Notice

■ 26. The district court found that Prudential breached its covenant of good faith and fair dealing when it failed to inform Winrock of its plans to eliminate the courtyard. However, Prudential had the right reserved in the lease to make any necessary changes in common areas, including the courtyard. Winrock agreed to the terms of the lease, which did not provide for notification in the event of changes to common areas. Prudential had no duty to inform Winrock of any plans for the courtyard.

■ 27. During oral argument to this Court, Winrock extensively discussed our Su-

preme Court's decision in *Video City, Inc. v. Linscott–Arnold, Ltd.,* No. 21,933 (N.M.S.Ct. Dec. 11, 1995). Winrock also cited *Video City, Inc.* in its reply brief. *Video City, Inc.* was unpublished, has no precedential value, and should not have been cited. *See* NMRA 1996, 12–405(C). Unpublished decisions are not meant to be used as precedent; they are written solely for the benefit of the parties. *State v. Gonzales,* 110 N.M. 218, 227, 794 P.2d 361, 370 (Ct.App.1990), *aff'd,* 111 N.M. 363, 805 P.2d 630 (1991). Because the parties know the facts of the case, a memorandum opinion may not describe fully the critical facts upon which the case was decided. *Id.* When the facts of a case are not fully known, it is not possible to know whether it can be accurately distinguished from similar cases. *Id.* For that reason, Winrock errs in citing the *Video City, Inc.* outcome as controlling in this case.

28. Winrock adduced no evidence at trial to show loss of business due to the elimination of the courtyard. The record contains no evidence to support the district court's finding of irreparable harm to Winrock. We reverse the district court's finding that Prudential's failure to inform Winrock of the impending elimination of the courtyard constituted a substantial, material breach of the lease so as to excuse Winrock's own breach when it withheld CAM charges.

*Insurance Charges, New Roof, Loop Road, and 10% Fee*

29. The district court determined that Prudential breached its duty of good faith and fair dealing, and its fiduciary duty to Winrock, when it failed to provide reasonable details to support the assessments for insurance. Notwithstanding the parties' agreement to arbitrate these matters, the district court decreed that all insurance charges from April 1991 onward were to be forfeited until Prudential rendered an adequate accounting of the charges. The district court also made a ruling as to other common area charges, some of which benefitted Prudential and some of which benefitted Winrock. In light of our determination that Prudential did not breach the lease by failing to inform Winrock of its plans and because of the lease provision

requiring arbitration, we also vacate the decision regarding the new roof, loop road, 10% fee, and forfeiture of insurance charges.

30. We note that a court may not issue a ruling *sua sponte* on an issue that the parties have agreed to arbitrate and that is pending in arbitration. *See Christmas v. Cimarron Realty Co.,* 98 N.M. 330, 332, 648 P.2d 788, 790 (1982); *see also Bernalillo County Medical Ctr. Employees' Ass'n v. Cancelosi,* 92 N.M. 307, 308–09, 587 P.2d 960, 961–62 (1978) (court must order arbitration when provision for it is clear). The court's jurisdiction, by its order of June 29, 1993, was limited to deciding the injunctive relief and eviction issues. To go beyond that jurisdiction put the parties at a disadvantage and was an inefficient use of judicial resources, particularly when arbitration was pending.

31. The court found that Winrock acknowledged that it owed insurance charges. Prudential had paid for insurance coverage, and the dispute was about how much Winrock needed to reimburse Prudential. The proper remedy under these circumstances was to allow the arbitrator to order and oversee an accounting by Prudential. The arbitrator could then make a determination as to the proper amounts owed by Winrock to Prudential. Monetary damages were pending in arbitration between the parties. The issue of forfeiture of the insurance charges was not raised by the pleadings and was not tried by the express or implied consent of the parties because all of the evidence admitted was relevant to the issues of injunction and eviction. *See Pacheco v. Martinez,* 97 N.M. 37, 43, 636 P.2d 308, 314 (Ct.App. 1981). The proper disposition of the insurance charges in the district court was to hold the parties to the terms of their lease contract, which provided for arbitration. *See Christmas,* 98 N.M. at 332, 648 P.2d at 790.

32. Similarly, the district court's findings with regard to the CAM charges for the loop road expenses, the costs of the new roof, the 10% administrative fee, and the Merchant's Association dues must be vacated so that they may be resolved in arbitration. The parties agreed to arbitrate disputes arising from the CAM charges. Arbitration was the dispute resolution mechanism chosen by the

parties in their integrated lease contract. *See K.L. House Constr. Co. v. City of Albuquerque*, 91 N.M. 492, 493–94, 576 P.2d 752, 753–54 (1978). Having issued an order indicating that the district court would limit evidence and its rulings to the injunctive relief and eviction issues, the district court was limited to deciding these issues.

### Covenant of Quiet Enjoyment

▊▊▊▊ 33. The district court in the case at bar found that Prudential's actions in filling the courtyard constituted a breach of Winrock's right of quiet enjoyment. In theory, to state a claim for a breach of quiet enjoyment, the severity of interference must be such that the premises become unfit for the purpose for which they were leased. *See May v. Marijo Corp.*, 207 Neb. 422, 299 N.W.2d 433, 434 (1980). To sustain a claim for breach of the covenant of quiet enjoyment, a tenant must show that he was actually or constructively evicted. *Honce v. Vigil*, 1 F.3d 1085, 1090 (10th Cir.1993); *El Paso Nat'l Gas Co. v. Kysar Ins. Agency, Inc.*, 98 N.M. 86, 87, 645 P.2d 442, 443 (1982). Constructive eviction occurs when the landlord's actions substantially deprive the tenant of the beneficial use of the leased premises and the tenant vacates, or when the landlord acts maliciously and his actions are so severe as to interfere with the tenant's peaceful enjoyment of the premises. *Honce*, 1 F.3d at 1091. Acts which merely inconvenience the tenant do not constitute constructive eviction. *Id.* In addition, the lease itself stipulated that the exercise of Prudential's rights under the lease would not be deemed to disturb Winrock's possession.

34. In this case, we determine as a matter of law that there is insufficient evidence in the record to show that Winrock suffered damage of the magnitude contemplated by an action for breach of an implied covenant of quiet enjoyment. The loss of a convenient access to the Mall and the elimination of natural light simply do not rise to the level of a breach of quiet enjoyment.

### Eviction

▊▊▊ 35. We turn now to an examination of the district court's findings and conclu-

sions concerning Prudential's demand that Winrock be evicted. It appears that the court found that Prudential committed prior breaches of the lease by hiding its plans for the new West End configuration of the Mall, and by filling in the courtyard, thereby eliminating Winrock's benefits from the courtyard. Our reversal of these findings and our holding that Prudential did not breach the lease may remove the linchpin from Winrock's argument that it is entitled to equitable relief from eviction. However, the district court's findings of prior breaches of the lease may have included breaches in addition to those involving the courtyard, and the district court also found that it would be unconscionable to evict Winrock for its default under the lease. Because these findings were not further explained, we believe that the decision regarding whether Winrock should be evicted should be made by the district court in the first instance. *See Blake v. Blake*, 102 N.M. 354, 368, 695 P.2d 838, 852 (Ct.App.1985) (recognizing that reversal on one issue may implicate the trial court's disposition of other issues). We therefore remand for a redetermination of this issue, together with the making of appropriate findings and conclusions supporting the decision.

▊▊▊ 36. We note the district court's findings, which are substantiated by the evidence, that Winrock intentionally committed its breaches of the lease in failing to pay the various charges that were owed. In revisiting this issue on remand, we emphasize that, in New Mexico, as we have held above, courts may not rewrite obligations that the parties have freely bargained for themselves. In the absence of fraud, unconscionability, or other grossly inequitable conduct, New Mexico courts do not have discretion either to relieve parties to a commercial lease of their contractual obligations or to interfere with contractual rights and remedies which go to the heart of the bargain. A landlord's right to timely payment of rent, and its concomitant right to terminate in the event of nonpayment, as negotiated by the parties to the lease in this case, is ordinarily just such a right.

## CONCLUSION

37. We vacate the district court's determination that Winrock had implied easements for access through and natural light from the courtyard. We hold that Prudential owed no duty to Winrock to inform it of changes to be made to the courtyard and did not breach the implied covenants of good faith and fair dealing by removing the courtyard, nor did Prudential's actions breach the covenant of quiet enjoyment. We vacate the district court's decisions regarding the forfeiture of insurance charges, the loop road expenses, the roofing project, the Merchant's Association dues, and the ten-percent administrative fee and remand with instructions that these issues be decided in arbitration proceedings according to the parties' lease contract. We remand the determination of whether Prudential is entitled to the remedy of eviction in light of our decision and considering the actions of each party toward the other. Prudential shall recover its costs for its appeal. To the extent that there are any separate costs for the cross-appeal, each party shall bear them.

38. **IT IS SO ORDERED.**

APODACA, C.J., and BOSSON, J., concur.