1998-NMCA-059

958 P.2d 745

Dana MILLER and Audrey Miller,
Plaintiffs–Appellants,

v.

Floyd O. JOHNSON and V. Marie
Johnson, Defendants–
Appellees.

No. 17537.

Court of Appeals of New Mexico.

March 18, 1998.

Norman E. Todd, Las Cruces, for Plaintiffs-Appellants.

L. Michael Messina, Glenn R. Smith, Messina, Madrid & Smith, P.A., Albuquerque, for Defendants-Appellees.

## OPINION

BUSTAMANTE, Judge.

{1} This case arises out of Plaintiffs Dana and Audrey Miller's (Buyers) complaint for declaratory judgment and injunctive relief to halt Defendants Floyd O. and V. Marie Johnson's (Sellers) termination of Buyers' rights under a New Mexico real estate contract for the purchase of a mobile home park. After a bench trial on the merits, the trial court ruled in favor of Sellers and awarded them $16,473.97 in attorney's fees.

{2} Buyers appeal, raising three issues: (1) whether disrepair, not amounting to waste, is a legally sufficient basis for terminating the real estate contract; (2) whether the trial court erred by failing to order reinstatement and specific performance of the real estate contract or abused its discretion by allowing Sellers to declare a forfeiture of the contract; and (3) whether the trial court abused its discretion in awarding Sellers attorney's fees. Determining that the trial court did not abuse its discretion in awarding attorney's fees or in allowing the forfeiture based on a combination of the failure to repair and the failure to cure the delinquent monthly installments, we affirm.

## FACTS

{3} Sellers were the owners of a mobile home park located in the City of Las Cruces. In 1979, they sold the mobile home park by real estate contract to Russell C. Keithline and Josephine Perry. Keithline and Perry defaulted below and are not part of this appeal. Keithline and Perry agreed to pay $180,000 to purchase the mobile home park. They paid $40,000 to Sellers at the time of closing and agreed to pay monthly installments of $1,272.18 on the balance due. The contract provided that the property shall be kept "in good condition, and [that the Buyers] shall not permit any waste to be committed upon the property." The contract also required Sellers' consent prior to any assignment or transfer of the contract, and payment of attorney's fees to the prevailing party in any court action to enforce the contract.

{4} In 1988, Keithline and Perry sold and assigned their interest in the mobile home park to Buyers. Buyers agreed to pay a total purchase price of $220,000 and assumed all obligations to Sellers under the contract with Keithline and Perry, including the obligation to pay monthly installments of $1,272.18. Sellers were aware of Buyers' purchase and assumption of the contract and consented to the transaction.

{5} On June 1, 1993, Buyers sold and assigned their interest in the mobile home park to Vaughn Bourget for a purchase price of $284,000. Buyers received a down payment from Bourget of $29,000. In their arrangement with Bourget, Buyers agreed to continue paying Sellers the monthly installments of $1,272.18. While Bourget assumed the other obligations under the original real estate contract, it is undisputed that Buyers remained directly obligated to Sellers. Sellers were not aware of the sale to Bourget and did not consent to that transaction.

{6} In November 1994, Bourget failed to make the monthly installment under his contract with Buyers. Buyers in turn failed to pay the monthly installment to Sellers. In December 1994, Bourget failed to make a second monthly installment, and Buyers then caused a written default notice to be sent to him. Buyers also failed to make the December 1994 installment to Sellers. Bourget then failed to make the January and February 1995 payments, and Buyers in turn failed to pay these installments to Sellers. Bourget attempted to sell the mobile home park to a third party, and Buyers awaited the outcome of the proposed sale rather than terminate Bourget's interest under the real estate contract. Sellers became aware of Buyers' transfer to Bourget when the defaults began to occur. Sellers were consulted to seek their consent to Bourget's potential sale to a third party. In February 1995, Bourget's attempted sale fell through. On February 10, 1995, Buyers terminated Bourget's interest under the contract and retook possession of the property.

{7} On February 10, 1995, Sellers caused written notice of default to be sent to Keithline and Perry and to Buyers. Sellers' written notice of default listed four events of default: (1) failure to pay monthly installments of $1,272.18 for the months of November and December 1994 and January and February 1995; (2) failure to pay property taxes and irrigation district levies for the years 1993 and 1994; (3) failure to keep the premises in good condition and state of repair; and (4) Buyers' transfer to Bourget without Sellers' consent. The real estate contract provided for thirty days to cure the default; the final day to cure defaults was March 13, 1995.

{8} After recording the special warranty deed from Bourget, Buyers inspected the park on February 10, 1995. Buyers testified they found the park to be in "deplorable" shape and in "terrible" condition. The parties' testimony conflicts about what steps Buyers took to remedy the default relating to failure to keep the premises in good repair. Buyers testified that they took steps to begin repairing the property and restoring it to "good condition ." Buyers testified that they talked to a representative of the New Mexico Environment Department to agree on a four to six month time frame for completing repairs to the septic system and that they hired a park tenant to be a temporary manager and to begin doing repair and clean-up work, including instructions to contact a local septic system contractor to visit the park and see what repairs needed to be done on the sys-

tem. Buyers further asserted they talked to park tenants and notified them of their resumption of management and paid some bills for septic tank and repair work. Buyers hired an attorney to pay the back taxes and irrigation district levies and to otherwise cure the defaults. After retaking possession on February 10, 1995, Buyers left on a trip to England on February 17, 1995. Prior to March 13, 1995, Buyers' attorney delivered a check in the amount of $1,272.18, one monthly installment, to the escrow agent. This check was returned since the amount tendered did not satisfy the payment defaults.

{9} Sellers testified that after Buyers received notice of default on February 10, 1995, they did nothing to repair the problems, but instead took an extended trip to England. Sellers submitted photographs of the property taken after they resumed possession of the park on March 14, 1995, to corroborate their testimony. Sellers' witnesses testified there had been a total lack of maintenance for a considerable number of years and that Buyers were repeatedly informed of these conditions even prior to their sale to Bourget.

{10} Charles Lamb at the Environment Department testified he had records of complaints from park tenants and adjoining property owners due to surfacing raw human sewage dating from January 1994. Lamb could not recall the specifics of a conversation with Buyers in February 1995. Lamb testified that the Department was willing to work with any responsible party as long as the Department was assured the nuisance and public health risks from surfacing sewage were being eliminated. While Buyers were still in England, on March 3, 1995, Lamb wrote to Dana Miller that he had "public health concerns because sewage continued to stand on the ground." The office manager at Johnny's Septic Tank Company testified, and her business records established, that Buyers' agent did not contact them until March 14, 1995, after the cure period had already elapsed.

{11} On March 13, 1995, the final day to cure the defaults, Buyers' attorney paid the property taxes and irrigation district levies for 1993 and 1994. He also contacted the escrow agent to determine the amount needed to pay for the months of November 1994 through February 1995. He was informed that the amount required to cure the payment defaults included a March 1995 payment of $5,162.00. He was also informed by the escrow agent that no payments would be accepted without a written statement from Sellers about repairs to the property.

{12} Buyers' attorney telephoned Sellers' attorney and sent a letter by fax on March 13, 1995, stating that funds were available to pay all monthly installments but that written authorization from Sellers was needed before the escrow agent would accept the funds. Other than the one monthly installment check, Buyers' attorney did not actually deliver a check or any funds to either the escrow agent or Sellers' attorney on or before March 13, 1995. On the afternoon of March 13, 1995, the two attorneys talked by telephone. While Buyers' attorney alleged that repairs had been made, Sellers' attorney asserted that his clients had viewed the premises and no repairs or cleanup had been made. Sellers' attorney stated Sellers had a list of 25–30 items which needed to be repaired before they would authorize the escrow agent to accept the payments.

{13} On the morning of March 14, 1995, Sellers went by the property and saw that it remained in deplorable condition. They elected to terminate the real estate contract and did so by affidavit to the escrow agent. On March 14, 1995, Buyers' attorney forwarded a check in the amount of $5,162.00 to the escrow agent together with a letter, indicating that Buyers felt that Sellers were wrongfully withholding a statement regarding repairs to the property. The escrow agent refused payment since Sellers had already terminated the real estate contract.

{14} Perry Cole accompanied Mr. Johnson to the property after Sellers regained possession on March 14, 1995. Mr. Cole testified that he saw human "feces all over the place in varying degrees of decomposition," an open trailer overflowing with trash, litter blowing all over the streets and in different yards, trees all overgrown and hanging down on the mobile homes and in the parking spaces, fences falling down, water leaks, and an overwhelming smell of sew-

age. Sellers submitted numerous photographs of the park taken during the first month they reclaimed it. The photographs corroborated Mr. Perry's and Sellers' testimony about the condition of the property.

{15} After Sellers retook possession of the property, they immediately began making repairs. They repaired and replaced manhole covers and tank lids on the septic system, removed the human waste, repaired vent stacks and sewer lines, pumped septic tanks, cleaned the property, hauled away rubbish, excavated leach lines, repaired the apartment units and broken fences, pruned tree branches, and repaired water leaks and a hole in the road. In November and December 1995, two new septic systems were installed. Sellers largely used personal friends and family members to do the work and used equipment they owned. Some persons were paid for some of their work. Sellers kept a log of the number of hours spent and receipts for bills paid. They estimated that by the end of December 1995, they had spent in excess of $75,000 making repairs to the park. Sellers testified that it may take another $75,000 to $100,000 to restore the property to good condition. Since Sellers elected to terminate the contract and retake the property, they did not claim damages for the amounts expended to repair the property. Testimony and documentation of the amounts spent were offered to establish the extensive nature of the lack of repair of the property when Sellers regained possession on March 14, 1995.

{16} After a bench trial, the trial court concluded that Buyers had defaulted under the terms of the real estate contract by failing to make the monthly payments within the time required to cure the default after notice. The trial court also concluded that the disrepair on the park premises did not rise to the level of waste, but that Buyers had defaulted under the terms of the real estate contract by failing to keep the property in good repair and failed to cure this default after notice. The trial court found that Buyers' defaults occurred over a substantial period of time and that nothing in the circumstances presented in connection with the termination of their interest in the real estate contract shocked the conscience of the court and/or required that, in equity, the termination be set aside. Judgment was entered in favor of Sellers. Sellers moved for an award of attorney's fees and submitted affidavits. The district court ordered Buyers to pay $16,473.97 for attorney's fees. Buyers appeal.

## DISCUSSION

### 1. Forfeiture Under the Real Estate Contract

{17} Buyers argue that the trial court's determination to enforce the terms of the real estate contract and allow the forfeiture was based on errors of law or lacked sufficient evidence to support it. Buyers first contend that disrepair not amounting to waste is a legally insufficient basis for terminating the real estate contract. Buyers argue that in the absence of waste, their failure to perform the "good repair" condition was not a material breach of the real estate contract under the factors set forth in the Restatement (Second) of Contracts § 241 (1981). However, the trial court's determination was based on the combination of the default occasioned by the failure to repair and the default occasioned by the failure to pay the monthly installments in a timely manner. Hence, we need not reach the issue of whether a forfeiture can be premised solely on a failure to keep the property in good repair. Rather, we only consider whether the failure to perform the "good repair" provision could be a material breach of the real estate contract, and whether that breach, in combination with the other factors, was sufficient to support the judgment of forfeiture.

{18} Buyers also urge this Court to order reinstatement and specific performance of the contract on the grounds that the purchaser under a real estate contract is in a legal position similar to that of a purchase-money mortgagor and is entitled to similar legal protections upon default.

{19} We believe Buyers' theories are unnecessary departures from existing New Mexico law. In New Mexico, the rule is well-settled that the type of real estate contract involved here is enforceable, unless enforcement would result in an unwarranted forfeiture or in unfairness which shocks the con-

science of the court. *Huckins v. Ritter*, 99 N.M. 560, 561–62, 661 P.2d 52, 53–54 (1983); *Hale v. Whitlock*, 92 N.M. 657, 657–58, 593 P.2d 754, 754–55 (1979); *Eiferle v. Toppino*, 90 N.M. 469, 470, 565 P.2d 340, 341 (1977). The real estate contract in this case allowed Sellers, upon Buyers' default, to terminate the real estate contract, regain possession of the property, and retain all payments made. We have repeatedly held such contracts to be enforceable, *First National Bank v. Cape*, 100 N.M. 525, 527–28, 673 P.2d 502, 504–05 (1983), and we have held that "[s]trong public policy favors enforcement of such contracts." *Manzano Indus., Inc. v. Mathis*, 101 N.M. 104, 104, 678 P.2d 1179, 1179 (1984).

{20} Buyers' reliance on the equitable exception to enforcement of forfeiture is misplaced. Not every case of default and forfeiture presents circumstances which shock the conscience of a court. *Compare Huckins*, 99 N.M. at 562, 661 P.2d at 54 (forfeiture not enforced), with *Manzano Industries*, 101 N.M. at 104–05, 678 P.2d at 1179–80 (forfeiture enforced). "Determination of whether a forfeiture provision of a real estate contract should be enforced is a matter within the sound discretion of the trial court...." *Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 102, 654 P.2d 548, 555 (1982). We find that the trial court's findings are supported by substantial evidence in the record we reviewed, and the findings of fact support the conclusions of law. *Sims v. Sims*, 1996–NMSC–078, ¶ 65, 122 N.M. 618, 930 P.2d 153 ("Findings of fact made by the district court will not be disturbed if they are supported by substantial evidence."). We also conclude that forfeiture in this case does not present circumstances which shock the conscience of the court.

### A. Failure to Timely Cure Delinquent Monthly Installments

{21} Tender is an offer to perform coupled with the present ability of immediate performance, so that the obligation could be satisfied but for the other party's refusal to cooperate. *Naumburg v. Pattison*, 103 N.M. 649, 653, 711 P.2d 1387, 1391 (1985). Buyers contend they satisfied their obligation to cure the delinquent monthly installments when their attorney offered to deliver a check to the escrow agent on March 13, 1995, and that Sellers refused to cooperate by withholding a statement regarding satisfaction of the failure to repair default.

{22} It is undisputed that Buyers did not deliver a check to pay the default in the monthly installments prior to the expiration of the cure period. The offer to deliver a check merely evidences an intention and does not constitute a tender, since the offer to deliver a check, as opposed to the presence of a check in the default amount, does not satisfy Buyers' obligation to cure the payment defaults.

{23} We hold that the trial court's determination that Buyers failed to cure the default for nonpayment of the monthly installments is supported by substantial evidence and that the trial court did not abuse its discretion in relying on this default, in part, to support its judgment of forfeiture. *See Manzano Indus.*, 101 N.M. at 105, 678 P.2d at 1180.

### B. Failure to Maintain the Premises in Good Repair

{24} The real estate contract provided that "[t]he Buyers shall keep the premises in good condition and shall not permit any waste to be committed upon the property." The obligation under the contract appears to be two-fold: to keep the premises in good repair and not to commit waste on the premises. Given the dual nature of the obligation, we believe the contract contemplates lack of repair short of waste as a potential ground for default. This interpretation is reasonable. Waste can generally be defined as an abuse or destructive use of property tending to cause or causing substantial injury to the property. Black's Law Dictionary 1589 (6th ed.1990). The concept assumes, as the term implies, serious, probably permanent damages. We can conceive of a level of damage short of waste which would nonetheless be of sufficient concern to a contract seller that intervention would be appropriate. We see no public policy reason to deprive a seller of recourse until damage serious enough to be deemed waste has been inflict-

ed. It is reasonable to provide the real estate contract seller a means of demanding reasonable repairs of the property upon discovery of conditions which can be expected to become waste if left unattended. It is for the trial court to determine, on a case by case basis, whether particular instances of disrepair are serious enough to constitute a breach of the contractual obligation to keep the property in "good repair," and we review such factual determinations to determine whether they are supported by substantial evidence.

{25} Here, there was a surfeit of evidence supporting the trial court's decision that the disrepair was material. Buyers testified that when Bourget forfeited his interest on February 10, 1995, they found the park to be in "deplorable" shape. While it appears that the disrepair largely occurred during Bourget's possession of the mobile home park, Buyers remained responsible to Sellers for the obligation to keep the premises in good repair. The trial testimony supports the view that after Buyers received notice of default on February 10, 1995, they did very little to repair the problems, but instead took an extended trip to England. The photographs of the property taken by Sellers on March 14, 1995, document the condition of the park when Sellers retook title and possession. Sellers' witnesses' testimony and the photographs support the trial court's conclusions that Buyers did nothing to remedy a deplorable situation during the thirty-day cure period and that there had been a "total lack of maintenance of the subject premises for a considerable period of time." Moreover, Buyers did not provide evidence to refute Sellers' estimate of the substantial decline in market value of the property because of the lack of maintenance. Neither did Buyers refute the evidence of the cost required to repair the premises.

{26} We hold that the trial court did not err in determining that the failure to keep the premises in good repair was a material breach of the contract. The trial court did not abuse its discretion in determining that Buyers failed to timely cure this default, or in relying on this failure, in combination with the failure to cure the delinquent monthly installments, to support its judgment of forfeiture. *See Manzano Indus.,* 101 N.M. at 105, 678 P.2d at 1180.

## C. Equitable Exception to Enforcement of Forfeiture Not Present

{27} Buyers argue that they suffered the forfeiture of a property worth more, by the most conservative estimate, than the balance owed against it. They also argue that they suffered the forfeiture of the income from that property which was more than twice the amount needed each month to pay the installment due to Sellers. Buyers point out that the market value of the property had climbed steadily—from $180,000 in 1979 to $220,000 in 1988 to $284,000 in 1993. They point out that the rental value of the property was substantial, generating a monthly income of $3,040 from space rentals. Buyers assert that Sellers "showed only their bare, legalistic right to enforce the provisions of the contract" while "this is precisely the type of unjust enrichment, and severe forfeiture, that New Mexico law is designed to prevent." We disagree.

{28} To determine whether a forfeiture shocks the conscience of the court, we have applied the following equitable considerations: the amount of money already paid by the buyer to the seller; the period of possession of the real property by the buyer; the market value of the real property at the time of default compared to the original sales price; and the rental potential and value of the real property. *See Buckingham v. Ryan,* 1998–NMCA–012, ¶ 7, 124 N.M. 498, 953 P.2d 33, No. 8, SBB 16. Such equitable circumstances as would avoid forfeiture are not present here.

{29} Buyers owned the mobile home park from 1988 when they purchased Keithline and Perry's interest until June 1993 when they sold their interest to Bourget. During the almost five years that they owned the park, Buyers received an average monthly income of $3,040 for space rent from mobile home tenants. Buyers' monthly obligation to Sellers was $1,272.18. Buyers retained approximately $1,767.82 per month, or about $123,000 over the five year period they

owned the property. When Buyers sold their interest in the property to Bourget, they received a $29,000 down payment plus $18,420, more or less, in monthly payments until Bourget defaulted. *Cf. id.* ¶ 10 (considering purchaser's opportunity to collect rent while in possession of property as equitable factor weighing in favor of forfeiture).

{30} At the time of default in this case, the principal balance owed to Sellers had been reduced from $165,000 to $95,313.83. Sellers estimated, and Buyers did not contradict, that when they repossessed it, the mobile home park's market value was only $100,000 to $110,000. Sellers provided evidence that they spent about $75,000 in labor, equipment, and hardware to repair the park during the first year after they regained possession, and that approximately $75,000 more would be needed. Thus, Sellers retrieved a property the value of which had significantly declined to a level only $5,000 to $15,000 more than the remaining amount owed to them. Sellers were able to restore the park to a habitable condition only through the expenditure of considerable effort and money. *Cf. id.* ¶ 11 (considering decrease in value of premises caused by purchaser's lack of maintenance or repair as equitable factor weighing in favor of forfeiture); *Jacobs v. Phillippi*, 102 N.M. 449, 451, 697 P.2d 132, 134 (1985) (considering repair payments incurred by sellers as a result of purchaser's default as equitable factor weighing in favor of forfeiture).

{31} Buyers assert that the condition of the mobile home park was all the fault of Bourget. But, even if true, this is of no aid to them. Under the chain of real estate contracts leading to Bourget, Buyers remained liable to Sellers. They were required to pay Sellers the monthly installments whether or not Bourget defaulted on his agreement, yet by March 13, 1995, Buyers were five months behind in monthly installments. The real estate taxes and other assessments were two years in arrears. And, as Mr. Johnson stated at trial: Buyers sold their interest to someone who "couldn't handle it. They gave them a mess; it became a worse mess. . . . They took the risk—they took the business risk of what would happen

when those people [Bourget] got in control of that park. . . ." Finally, the evidence supported the trial court's conclusion that the conditions at the mobile home park were the product of years of neglect, and that Buyers had allowed the property to deteriorate to a deplorable state.

{32} Accordingly, we hold that the trial court did not abuse its discretion in enforcing the forfeiture provisions of the real estate contract or in denying Buyers equitable relief from the forfeiture provisions of the real estate contract in this case. We agree with the trial court that the forfeiture of the contract to Sellers does not shock the conscience.

### 2. *Attorney's Fees*

{33} The real estate contract in this case provided that the prevailing party in any court action brought under the contract was entitled to recover reasonable attorney's fees. Buyers contend Sellers did not meet their burden of establishing the reasonableness of their fees and that the district court awarded excessive fees.

{34} The district court has broad discretion in setting attorney's fees, and an award will not be reversed unless there is an abuse of discretion. *Calderon v. Navarette*, 111 N.M. 1, 2–3, 800 P.2d 1058, 1059–60 (1990). Sellers' motion for fees was based on affidavits filed by both attorneys for Sellers, Michael L. Winchester and L. Michael Messina. The pretrial and post-trial work on the case was done by Mr. Winchester. Mr. Messina entered his appearance as co-counsel for Sellers and actually tried the case because Mr. Winchester became a witness. Mr. Winchester's affidavit discusses the following factors: time expended by the attorney; extent to which the issues were contested; novelty and complexity of the issues involved; experience in years of practice which the attorney has, including the hourly rate charged; the dollar amount involved in the case and description of the issues; the type of security held; an estimate of the time to be involved in collecting the judgment; and the amount the attorney believes would be a reasonable fee. *See id.* at 3, 800 P.2d at 1060 (listing factors relevant to determining

award of attorney's fees). Mr. Winchester asked for $6,612.50, plus gross receipts tax on that amount equal to $421.54. The Messina affidavit recites the reason for his appearance as co-counsel, the number of hours expended, the rate charged, his experience, the reasonableness of the amount of time spent in relation to the amount of work, the complexity and novelty of the issues, and the extent to which the matter was contested. The billable entries describing the services rendered by Mr. Messina and his associate and the total number of hours is attached to the affidavit. Mr. Messina asked the court to award $8,942.50 plus gross receipts tax on that amount equal to $497.43. Buyers did not file any written response to the claim for attorney's fees. After a hearing, the trial court awarded the amounts requested in the affidavits as reasonable attorney's fees in the total amount of $16,473.97.

{35} Buyers fail to summarize the arguments made at the hearing on the attorney's fees issue and fail to indicate the basis for the trial court's ruling below. However, Sellers were the prevailing party, and the affidavits of the attorneys set forth the services rendered and the amount of time spent in relation to the experience of the attorney providing the services, the complexity of the issues, and the extent to which they were contested. Under the circumstances, we are satisfied that the trial court did not abuse its discretion in awarding the amount of attorney's fees. There is nothing in the record to indicate that the fees claimed were unreasonable. Accordingly, we affirm the trial court's award of attorney's fees.

{36} **IT IS SO ORDERED.**

ALARID and ARMIJO, JJ., concur.