2003-NMCA-140

82 P.3d 535

**UNITED PROPERTIES LIMITED COM-PANY, a New Mexico limited liability company, Plaintiff/Counterdefendant–Appellee,**

v.

**WALGREEN PROPERTIES, INCORPO-RATED, an Illinois corporation, and Walgreen of New Mexico, Incorporated, a New Mexico corporation, Defendants/Counterplaintiffs–Third–Party Plaintiffs–Appellants,**

v.

**Casa Chevrolet, Inc., and Ford Leasing Development, Third–Party Defendants–Appellees.**

**Nos. 22,159, 22,298.**

Court of Appeals of New Mexico.

June 11, 2003.

Paul G. Bardacke, Kerry Kiernan, C. Shannon Bacon, Eaves, Bardacke, Baugh, Kierst & Kiernan, P.A., Albuquerque, NM, for Appellee United Properties Limited Co.

Steven L. Tucker, Tucker Law Firm, P.C., Santa Fe, NM, for Appellants Walgreen Properties, Inc. and Walgreen of New Mexico, Inc.

William D. Winter, Dines, Gross & Esquivel, P.C., Albuquerque, NM, for Appellee Casa Chevrolet, Inc.

Robert M. St. John, Tom Outler, Rodey, Dickason, Sloan, Akin & Robb, P.A., Albuquerque, NM, H. David Barr, Kurt D. Williams, Anthony D. Burgin, Berkowitz, Feldmiller, Stanton, Brandt, Williams & Shaw, LLP, Prairie Village, KS, for Appellee Ford Leasing Development Co.

## *OPINION*

PICKARD, Judge.

{1} In this case, we are presented with an issue related to commercial leases: will a late notice to the landlord of intent to renew the lease for another term be given effect when the lateness of the notice is due to the tenant's own negligence? We hold that the late notice was ineffective in the circumstances of this case. Consequently, we reverse.

### FACTS AND BACKGROUND

{2} This case concerns commercial property located at 7100 Lomas Boulevard NE in Albuquerque, New Mexico. The property was owned by Walgreen Properties since the 1960s. Initially, Walgreen Properties leased the property to Walgreen of New Mexico,

which subleased the property to Walgreen Corporation, which built and operated a discount retail store (Globe Discount City) on the property. The initial term of the lease and sublease was for twenty years, to expire on December 31, 1984, with an option to renew for up to six successive periods of five years each. The lease and sublease also provided that notice of intent to renew for additional five-year terms be given to Walgreen of New Mexico three months before the expiration of the five-year term then in effect.

{3} In 1978, Globe closed its doors and Walgreen Corporation assigned the sublease to K–Mart. When the original term of the lease expired in 1984, K–Mart renewed the lease for three additional terms of five years. In the mid–1990s, the K–Mart store closed. In 1994, United Properties Limited (UPL) bought out K–Mart's interest in the lease for $700,000. At that time, the rental payments on the lease were $44,640 per year, the term of the lease was due to expire on December 31, 1999, and there were three additional five-year terms remaining. UPL spent over $1.272 million on capital improvements to the property. These capital improvements included remodeling to adapt the property to UPL's use, landscaping, and bringing the existing facilities up to code, as well as enhancing the existing buildings with additional fixtures. Ultimately, UPL subleased various portions of the property to Casa Chevrolet, Ford Leasing Development, and Pacific Eatery. We refer to these three entities collectively as Subtenants. Together, the Subtenants pay a total of $263,500 a year rent to UPL.

{4} When UPL took over the property, the term of the lease was set to expire on December 31, 1999. Thus, if UPL wished to renew for an additional five-year term, it was required to give written notice of its intent to extend the lease for another five years no later than September 30, 1999. As counsel for Walgreen put it, UPL just "plain plumb forgot" to do that. On November 8, 1999, Walgreen notified UPL that the date for giving written notice of intent to renew had passed. The next day, UPL sent Walgreen of New Mexico a written notice that it elected to extend the sublease for an additional five years. However, on November 22, 1999, Walgreen of New Mexico notified UPL that it would not honor the notice and expected UPL and its Subtenants to vacate the premises by December 31, 1999.

{5} On December 2, 1999, while the lease was still in effect, UPL filed an action for injunctive and declaratory relief, acknowledging that it failed to send a timely notice and asking that the district court exercise its equitable powers to order Walgreen of New Mexico to extend the lease for another five-year term. The Subtenants also appeared in the case and made arguments to the district court in support of UPL's requested relief. Ultimately, both sides filed motions for summary judgment. UPL argued that strictly enforcing the three-month notice requirement of the lease would be inequitable and result in a forfeiture. Walgreen Properties and Walgreen of New Mexico argued that under New Mexico law the district court was required to strictly enforce the terms of the option to renew the lease. The Subtenants also argued that they would be harmed by strict enforcement of the three-month notice requirement. The district court granted the relief requested by UPL and its Subtenants. Walgreen Properties and Walgreen of New Mexico appealed to this Court. For the sake of clarity, we refer to Walgreen Properties and Walgreen of New Mexico as Landlord and UPL and its Subtenants as Tenant.

## STANDARD OF REVIEW

{6} When the facts are not in dispute and the district court enters summary judgment, we review the district court's application of the law to the facts of the case de novo. *Phoenix Indem. Ins. Co. v. Pulis*, 2000–NMSC–023, ¶ 6, 129 N.M. 395, 9 P.3d 639; *Barncastle v. Am. Nat'l Prop. & Cas. Cos.*, 2000–NMCA–095, ¶ 5, 129 N.M. 672, 11 P.3d 1234. We recognize that in other cases, we have stated that the decision of whether equitable relief should be granted is a matter within the sound discretion of the district court and is reviewed only for abuse of discretion. *See, e.g., Padilla v. Lawrence*, 101 N.M. 556, 562, 685 P.2d 964, 970 (Ct.App. 1984). However, as our Supreme Court has observed, "even when we review for an abuse

of discretion, 'our review of the application of the law to the facts is conducted de novo.'" *N.M. Right to Choose/NARAL v. Johnson,* 1999–NMSC–028, ¶ 7, 127 N.M. 654, 986 P.2d 450 (quoting *State v. Elinski,* 1997–NMCA–117, ¶ 8, 124 N.M. 261, 948 P.2d 1209).

■ {7} Thus, in cases such as this, the proper standard of review may be expressed as follows. The question of whether, on a particular set of facts, the district court is permitted to exercise its equitable powers is a question of law, while the issue of how the district court uses its equitable powers to provide an appropriate remedy is reviewed only for abuse of discretion. *See, e.g., Amkco, Co. v. Welborn,* 2001–NMSC–012, ¶¶ 8–9, 130 N.M. 155, 21 P.3d 24 (treating the question of the showing necessary to obtain injunction concerning an encroachment and the showing necessary to establish irreparable injury as issues of law and reviewing the district court's balancing of the equities under an abuse of discretion standard); *Nearburg v. Yates Petroleum Corp.,* 1997–NMCA–069, ¶¶ 7–9, 123 N.M. 526, 943 P.2d 560 (reviewing the district court's interpretation of a contract de novo and reviewing equitable relief granted by the district court under an abuse of discretion standard). In this case, Landlord does not contend that there was an abuse of discretion if the trial court had discretion to exercise in the first place. Landlord contends that contract principles preclude any exercise of discretion on these facts.

## DISCUSSION

{8} The precise issues raised by this case have been the subject of numerous appellate decisions from across the country. *See* William B. Johnson, Annotation, *Circumstances Excusing Lessee's Failure to Give Timely Notice of Exercise of Option to Renew or Extend Lease,* 27 A.L.R.4th 266, 277–80, 1984 WL 263120 (1984 & 2002 Supp.). At one end of the spectrum are cases that hold that:

[e]quity will not relieve a lessee of the consequences of his failure to give written notice of renewal of the lease within the time required by the provisions of the lease when the failure resulted from the negligence of the lessee unaccompanied by fraud, mistake, accident or surprise and unaffected by the conduct of the lessor.

*Ahmed v. Scott,* 65 Ohio App.2d 271, 418 N.E.2d 406, 411 (1979). At the other end of the spectrum are cases that hold that:

in cases of mere neglect in fulfilling a condition precedent of a lease, [even if the cases] do not fall within accident or mistake, equity will relieve when the delay has been slight, the loss to the lessor small, and when not to grant relief would result in such hardship to the tenant as to make it unconscionable to enforce literally the condition precedent of the lease.

*F.B. Fountain Co. v. Stein,* 97 Conn. 619, 118 A. 47, 50 (1922).

{9} At oral argument, both parties characterized the differences in the cases as reflecting a true split of authority. Although some cases have held that one view or another is the "majority" rule or the "modern" rule, we believe that such characterizations are not particularly helpful. For example, the court in *Trollen v. City of Wabasha,* 287 N.W.2d 645, 647 (Minn.1979) characterized the *Fountain* rule as the "modern" rule. Yet, the latest two jurisdictions to weigh in on this issue after canvassing the authorities on both sides have squarely sided with the traditional rule favoring definiteness of contracts. *See SDG Macerich Props., L.P. v. Stanek, Inc.,* 648 N.W.2d 581, 587–89 (Iowa 2002); *Utah Coal & Lumber Rest., Inc. v. Outdoor Endeavors Unlimited,* 40 P.3d 581, 583–85 (Utah 2001). Similarly, one California Court of Appeals rejected the reasoning of another California Court of Appeals in language suggesting that the first court failed to follow the "better-reasoned," "majority" rule of *Fountain,* but did so in a case whose facts would have met the traditional rule. *Compare Bekins Moving & Storage Co. v. Prudential Ins. Co.,* 176 Cal.App.3d 245, 221 Cal.Rptr. 738, 741–42 (1985) (rejecting the *Fountain* rule because an option creates no vested rights and therefore the conditions of it must be strictly met), *with Romasanta v. Mitton,* 234 Cal.Rptr. 729, 730–31 (Cal.Ct. App.1987) (unpublished decision) (rejecting *Bekins Moving & Storage Co.* in a case involving an unsophisticated lessee who attempted to give timely oral notice of exercis-

ing option to a sophisticated lessor who seemed to acquiesce in lessee's notice thereby potentially bringing the case within the rule that the lessee's act was not unaffected by the lessor's conduct). Thus, instead of characterizing the cases, we perceive that our task in this case is to decide which view best reflects the law and its policy underpinnings in New Mexico. For the reasons that follow, we conclude that the view that favors the definiteness of contracts is the view most consistent with New Mexico law.

### 1. General Contract Principles

{10} In *Nearburg*, 1997–NMCA–069, ¶ 31, 123 N.M. 526, 943 P.2d 560, we summed up the governing principles of New Mexico contract law as follows:

> Parties to a contract agree to be bound by its provisions and must accept the burdens of the contract along with the benefits. When a contract was freely entered into by parties negotiating at arm's length, the duty of the courts is ordinarily to enforce the terms of the contract which the parties made for themselves. Although a contract may be declared void where it is unconscionable and oppressive in its terms, nevertheless, the fact that some of the terms of the agreement resulted in a hard bargain or subjected a party to exposure of substantial risk, does not render a contract unconscionable where it was negotiated at arm's length, and absent an affirmative showing of mistake, fraud or illegality. A court should thus not interfere with the bargain reached by the parties unless the court concludes that the policy favoring freedom of contract ought to give way to one of the well-defined equitable exceptions, such as unconscionability, mistake, fraud, or illegality.

(Internal quotation marks and citations omitted.) In *Cafeteria Operators v. Coronado–Santa Fe Assocs.*, 1998–NMCA–005, ¶¶ 20, 23, 124 N.M. 440, 952 P.2d 435, we applied the principle that there is broad public interest in protecting the right of private parties to be secure in the knowledge that their contracts will be enforced and affirmed a district court decision requiring an entire commercial building to be torn down because it was built in violation of a restriction contained in the lease between the parties. Both *Cafeteria Operators* and *Nearburg* followed *Winrock Inn Co. v. Prudential Ins. Co.*, 1996–NMCA–113, ¶¶ 17, 36, 122 N.M. 562, 928 P.2d 947, and the case it relied on, *Smith v. Price's Creameries*, 98 N.M. 541, 545, 650 P.2d 825, 829 (1982), for the proposition that "courts may not rewrite obligations that the parties have freely bargained for themselves ... [i]n the absence of fraud, unconscionability, or other grossly inequitable conduct."

{11} Although we referred to the obligation to pay "rent" in *Winrock Inn*, 1996–NMCA–113, ¶ 36, 122 N.M. 562, 928 P.2d 947, what was at issue in that case was the failure to pay common area maintenance charges. *Id.* ¶¶ 8–9. We further recognize that a mere failure to timely pay rent may in some circumstances be cured by late tender, *N.M. Motor Corp. v. Bliss*, 27 N.M. 304, 307, 201 P. 105, 106 (1921), because, as stated in the authority cited in the case relied upon in *New Mexico Motor Corp.*,

> The grounds upon which a court of equity proceeds [in the case of rent that is tendered a few days late together with interest] are, that the rent is the object of the parties, and the forfeiture [of the lease] only an incident intended to secure its payment; that the measure of damages is fixed and certain, and that when the principal and interest are paid the compensation is complete. In respect to other covenants pertaining to leasehold estates, where the elements of fraud, accident, and mistake are wanting, and the measure of compensation is uncertain, equity will not interfere. It allows the forfeiture to be enforced if such is the remedy provided by the contract.

*Sheets v. Selden*, 74 U.S.(7 Wall) 416, 421–22, 19 L.Ed. 166 (1868), relied on in *Kann v. King*, 204 U.S. 43, 54–55, 27 S.Ct. 213, 51 L.Ed. 360 (1907), which was quoted in *New Mexico Motor Corp.*

{12} Thus, we decide this case against a long-standing backdrop of New Mexico law enforcing contractual obligations as they are written. In doing so, we point out that there is nothing to construe in this case. As in

similar cases from other jurisdictions, we note that the lease agreement here was clear as can be, and there is no contention that it is ambiguous. *See, e.g., SDG Macerich Props.,* 648 N.W.2d at 587 ("Nothing about this option to renew provision is remotely ambiguous."). There being nothing to construe, we are not persuaded that *Stamm v. Buchanan,* 55 N.M. 127, 132, 227 P.2d 633, 636 (1951), a case Tenant relies on for the proposition that equity will intercede to avoid a forfeiture in the case of commercial leases, applies here. *Stamm* involved a lease that was ambiguous and therefore in need of construction; *Stamm* specifically held that if the language plainly allowed what the lessor wanted to do, "the courts [would be] left [with] no alternative but to enforce it according to the letter." *Id.* at 135, 227 P.2d at 638. We similarly note that there is no contention that the terms of the lease themselves were unconscionable.

### 2. Options and the Law Governing Them

■ {13} Landlord argues that New Mexico law holds that an option must be exercised strictly according to its terms and that the failure to exercise an option does not result in a forfeiture. Indeed, this Court and our Supreme Court have held that when the parties enter into an option contract for the purchase of land, the option must be exercised according to the terms of the contract. *Skarda v. Davis,* 83 N.M. 342, 346, 347, 491 P.2d 1153, 1157, 1158 (1971); *Cillessen v. Kona Co.,* 73 N.M. 297, 301, 387 P.2d 867, 870 (1964); *Master Builders, Inc. v. Cabbell,* 95 N.M. 371, 374, 622 P.2d 276, 279 (Ct.App. 1980). The rule has also been applied to an option to increase leased space in the situation where one cotenant leases the commonly owned premises. *See Northcutt v. McPherson,* 81 N.M. 743, 745, 473 P.2d 357, 359 (1970). Under these cases, the person holding the option to purchase has no legal rights in the land unless and until the option is exercised according to its terms. Thus, by definition, the failure to exercise an option does not result in a forfeiture. *See id.* at 746, 473 P.2d at 360; *Cillessen,* 73 N.M. at 301, 387 P.2d at 870.

{14} We recognize that this case could be viewed differently. In *Nearburg* and most other option cases, the owner of the option had not paid the near $2,000,000 that Tenant has expended here. Further, in this case, as is the case with many commercial ground leases, in order to encourage the tenants to spend significant amounts of money in adapting the property to their purposes, the landlord gave the tenants the right to renew the arrangement for a lengthy period of time. *See* Jerome D. Whalen, *Commercial Ground Leases* §§ 1.1 to 1.8 (2d ed.2002); 2 Milton R. Friedman, *Friedman on Leases* Ch. 14 (4th ed.1997).

{15} Nonetheless, the fact remains that the option was required to be exercised in a certain way according to the lease agreement signed by the parties. Other cases in the lease-renewal situation have held that there is no forfeiture calling for equitable intervention in circumstances where a lessee has simply neglected to give timely notice, even when there is a large difference between the rent the lessee pays and the rent that could be demanded or when the lessee has expended considerable sums of money on improvements. *See Trueman–Aspen Co. v. N. Mill Inv. Corp.,* 728 P.2d 343, 344 (Colo.Ct.App. 1986); *W. Tire, Inc. v. Skrede,* 307 N.W.2d 558, 562–63 (N.D.1981).

■ {16} The way the option was required to be exercised in this case was by "send[ing] notice thereof to Landlord at least three months prior to the expiration" of the then term of the lease. When option or other contracts contain specific time limitations, time is of the essence. *See, e.g., SDG Macerich Props.,* 648 N.W.2d at 586; *Rounds v. Owensboro Ferry Co.,* 253 Ky. 301, 69 S.W.2d 350, 354–55 (1934); *Sentara Enters., Inc. v. CCP Assocs.,* 243 Va. 39, 413 S.E.2d 595, 597 (1992). Further, the exercise of an option in the manner spelled out in the contract is a condition precedent to enforcing the option. *Id.*

{17} Tenant has argued that instead of applying the law concerning option contracts, we should apply the law concerning real estate contracts. Under real estate contract law, the courts recognize that the buyer has an equitable right to the land such that equi-

ty will protect the buyer from unwarranted forfeitures or unfairness that would shock the conscience of the courts. *See, e.g., Huckins v. Ritter,* 99 N.M. 560, 562, 661 P.2d 52, 54 (1983); *Miller v. Johnson,* 1998–NMCA–059, ¶ 19, 125 N.M. 175, 958 P.2d 745; *Buckingham v. Ryan,* 1998–NMCA–012, ¶ 7, 124 N.M. 498, 953 P.2d 33. We do not believe that the special case of real estate contracts should be relied on in cases involving the notice provisions of large-scale commercial leases. Our cases recognize that the device of real estate contracts allows many people to become property owners with very small down payments and with payments over many years in a manner likened to rent. *See Bishop v. Beecher,* 67 N.M. 339, 342, 355 P.2d 277, 279 (1960).

{18} In addition, even in real estate contracts, it is not every apparently large loss that amounts to unfairness that shocks the conscience of the court. For example, in *Bishop,* in which the rule was established, the court ruled that the tenant's payments of about one-third of the value of the property over the course of six years could be likened to rent and therefore did not shock the conscience, *id.* at 343, 355 P.2d at 279–80, and in *Buckingham,* the court ruled that loss of a $25,000 down payment ... was not sufficient to shock the conscience of the court. 1998–NMCA–012, ¶ 16, 124 N.M. 498, 953 P.2d 33. To the extent that other cases appear to deny forfeiture on similar facts, *see, e.g., Huckins,* 99 N.M. at 562, 661 P.2d at 54, we believe that applying their reasoning in this case will have a negative impact on the conduct of business in New Mexico, as will be demonstrated below.

### 3. Equitable Considerations

{19} "Equity jurisdiction has never given the judiciary a roving commission" to do whatever it wishes in the name of fairness or public welfare. *In re Adoption of Francisco A.,* 116 N.M. 708, 730, 866 P.2d 1175, 1197 (Ct.App.1993) (Hartz, J., concurring in part and dissenting in part). In this section, we explain why adherence to the rule of law requires a decision in favor of Landlord. In so doing, we must also explain why we do not

adopt the *Fountain* rule and why we reject some of Tenant's arguments.

### a. *F.B. Fountain Co.* Rule

{20} Tenant relies most heavily on *Car–X Serv. Sys., Inc. v. Kidd–Heller,* 927 F.2d 511, 514–17 (10th Cir.1991), and *J.N.A. Realty Corp. v. Cross Bay Chelsea, Inc.,* 42 N.Y.2d 392, 397 N.Y.S.2d 958, 366 N.E.2d 1313, 1317 (1977), both of which relied on the value of improvements made by the tenant and a balancing of the harms visited upon either the landlord or the tenant. Landlord, in turn, relies on the dissent in *J.N.A. Realty Corp.,* 397 N.Y.S.2d 958, 366 N.E.2d at 1321–22. Landlord expresses concern for the "instability and uncertainty" that it contends would ensue if we adopted the rule allowing equity to intervene. Landlord suggests that the rule adopted by the district court would, in the words of Chief Judge Breitel, "allow for *ad hoc* dispensations in particular cases without [the] reliable rule so essential to commercial enterprise." *Id.* at 1321 (Breitel, C.J., dissenting). Landlord also points to another concern expressed in the dissent: allowing relief in these circumstances would allow a tenant, "under the guise of sheer inadvertence, [to] gamble with a fluctuating market, at the expense of his landlord, by delaying his decision beyond the time fixed in the agreement." *Id.* We are most persuaded by the concern of instability and uncertainty. We think that the concern about gambling with the market could easily be remedied by adoption of a rule that excluded such intentional acts from its scope.

{21} We do not perceive that adoption of the rule relied on by the district court is certain enough to provide the necessary stability and predictability for commercial transactions. A few examples will demonstrate. The *Fountain* rule contains three basic elements: (1) that the delay in giving notice be slight, (2) that the loss to the landlord be small, and (3) that the loss to the tenant be so large that it would be unconscionable to enforce the notice provision.

{22} We begin with the length of delay. In *Fountain* itself, the delay was four days and the notice period was supposed to be thirty days. In our case, the delay was

about forty days and the notice period was supposed to be about ninety days. Thus, in our case, the delay was almost half the notice period. In the jurisdiction deciding *Fountain*, the delay is measured against the notice period to determine whether the delay is slight, and thus Connecticut holds that notice given five and one-half months into a six-month notice provision does not qualify, even if the reason for the late notice is excusable, i.e., terminal illness in the family of the person required to give notice. *See Tartaglia v. R.A.C. Corp.*, 15 Conn.App. 492, 545 A.2d 573, 574 (1988). On the other hand, Hawaii is a jurisdiction that follows *Fountain*, and it measures the notice against the potential term of the lease, such that a four-month late notice for a six-month notice period is not unreasonably long considering that the lease was for a ten-year term that could extend out to fifty years. *See Aickin v. Ocean View Invs. Co.*, 84 Hawai'i 447, 935 P.2d 992, 1000 (1997). In our opinion, the Hawaii rule practically nullifies any reasonable meaning of the word "slight." The difficulties of applying a rule involving "slight" delay indicate to us that the *Fountain* rule is simply too uncertain to apply in a state like New Mexico that highly values the stability of commercial transactions.

{23} Another difficult area concerns the second and third elements of the *Fountain* test, which have to do with the loss to the parties. In our case, Landlord had not changed its position to its prejudice, but once the notice was not forthcoming, it had an expectation that the trial court's ruling frustrated. *See W. Tire, Inc.*, 307 N.W.2d at 562 (indicating that being required to accept lower rental payments amounts to prejudice to landlord). The loss to Tenant appears at first blush to be large if one calculates it at the $2,000,000 Tenant paid to take over the K–Mart lease and build improvements. But the calculation of what Tenant has recouped already (inasmuch as its payments owed to Landlord are much less than what it is taking in from the Subtenants) shows that Tenant's loss is considerably less than its expenditures. *See Rounds*, 69 S.W.2d at 356 (indicating that loss is not great when investment has been recouped). Again, the difficulty of predict-

ably following known standards militates against adopting the *Fountain* rule in New Mexico.

{24} Moreover, we believe that adoption of the *Fountain* rule would allow courts to change the basic nature of the parties' agreements, contrary to what they have bargained for at arm's length. For example, the lease in this case required Tenant to give notice three months prior to the end of the lease term if Tenant wished to extend the lease to another five-year term. In contrast, Tenant on appeal argues that Landlord has failed to do equity because "[Landlord] was required to provide [Tenant] with notice of the breach [i.e., the failure to give the required notice], demand that [Tenant] cure the breach and provide [Tenant] the opportunity to cure the breach." There was no breach in this case, and to argue as Tenant does stands the lease provision on its head.

{25} We consider the practical effect of Tenant's argument in circumstances like those provided for in the lease in this case. Toward the end of the current lease term, a landlord will wonder whether a tenant will renew. The three-month notice provision is designed to allow the landlord sufficient time to seek other tenants. If the landlord waits until the end of the three-month period and the tenant has still not renewed, the cases are uniform in ruling that the landlord can evict the tenant. *See, e.g., Duffy v. Casady*, 29 Kan.App.2d 549, 28 P.3d 1040, 1042–43 (2001) (applying the *Fountain* rule only if notice is given during the term of the lease). In our case, Landlord waited until about half of the notice period had expired before notifying Tenant of Tenant's failure to give notice. Tenant's argument would have Landlord responsible for giving notice of Tenant's failure to give notice, which would then prompt Tenant to give notice, which again stands the provision of the lease on its head. If the parties had wanted Landlord to be responsible for prompting Tenant, they could have so written the lease. The parties not having done so, the district court should not rewrite the lease for the parties.

{26} Finally, we note that the facts of several of the cases, alleged to stand for the

proposition that the *Fountain* rule has been adopted in a particular jurisdiction, would call for relief even under the traditional rule. Thus, as was pointed out in *Guy Dean's Lake Shore Marina, Inc. v. Ramey*, 246 Neb. 258, 518 N.W.2d 129, 132 (1994), the landlord in *J.N.A. Realty*, on which Tenant so heavily relies, had regularly informed the tenant in that case of various of its other obligations so that it could be fairly said that the tenant's neglect was to some extent affected by the landlord's behavior. Similarly, in *Duncan v. G.E.W., Inc.*, 526 A.2d 1358, 1365 (D.C.1987), in the court's recap of its holding, the first factor emphasized was that "the failure to give the required notice was the result of an honest mistake, and not mere neglect." Thus, we believe that allowing a court to weigh the equities in cases of mere neglect would allow courts to be roving commissions, engaging in after-the-fact determinations of fairness that would be contrary to the parties' bargains and contrary to the rules of law surrounding equitable intervention in virtually all of the reported cases.

#### b. Tenant's Other Contentions

{27} Tenant argues that, even if we do not adopt the *Fountain* rule, the judgment should be affirmed under traditional New Mexico law. It relies on two factors. First, it argues that, under *Winrock Inn*, the notice provision must be considered at the "heart of the [parties'] bargain" before equity should not step in and that Landlord knew, from prior negotiations, that Tenant was going to exercise all options to renew. *See* 1996–NMCA–113, ¶ 36, 122 N.M. 562, 928 P.2d 947. Second, it argues that its negligence is no different from mistake and that mistake is a traditional reason for equity to act. We disagree with both arguments.

{28} *Winrock Inn* does say that, "[i]n the absence of fraud, unconscionability, or other grossly inequitable conduct, New Mexico courts do not have discretion either to relieve parties to a commercial lease of their contractual obligations or to interfere with contractual rights and remedies *which go to the heart of the bargain." Id.* (emphasis added). We do not understand how Tenant can claim that the notice period inserted into the lease

and which other courts have called a condition precedent indicating that time is of the essence does not go to the heart of the parties' bargain. Moreover, if there were any doubt about it, the parties' prior negotiations, far from showing that Landlord knew that Tenant would exercise the options, indicated that Landlord would require Tenant to adhere to the letter of the lease agreement. When Tenant negotiated with Ford Leasing, it negotiated a long-term lease for nineteen years and six months, and it wished Landlord to agree to a subordination agreement that would, among other provisions, relieve it of the obligation of providing notice at the end of each term. Landlord specifically rejected Tenant's proposal, which left Tenant in the position of having to provide the required notice.

{29} As stated earlier in this opinion, relying on the *Ahmed* case, mistake is one of the traditional exceptions that would allow equity to intervene in a case of late notice. "Mistake, of course, is a fountainhead of equity jurisprudence." *Crown Life Ins. Co. v. Candlewood, Ltd.*, 112 N.M. 633, 637, 818 P.2d 411, 415 (1991). Tenant relies on the language in the *Crown Life Ins. Co.* opinion which appears to equate negligence with mistake. *See id.* at 637–38, 818 P.2d at 415–16. However, since *Crown Life Ins. Co.* involved foreclosure, which is equitable in nature to begin with, *Las Campanas Ltd. P'ship v. Pribble*, 1997–NMCA–055, ¶ 9, 123 N.M. 520, 943 P.2d 554, we do not read it for the proposition that a party's mere negligence operates the same way as mistake and should always constitute a threshold showing that allows equity to intervene in any case.

{30} Instead, we believe that the mistake that constitutes the threshold showing allowing equity to intervene is the type of mistake that is defined in the cases specifically addressing whether to hold parties to their freely negotiated bargains:

> A mistake within the meaning of equity is a non-negligent but erroneous mental condition, conception, or conviction induced by ignorance, misapprehension, or misunderstanding, resulting in some act or omission done or suffered by one or both parties, without its erroneous char-

acter being intended or known at the time.

[Tenant] does not argue it misunderstood the terms of the contract. It does not contend it was unaware of the notice provision. Rather, the facts before us show [Tenant] failed to exercise its option because of simple forgetfulness. Forgetfulness is not the equivalent of a mistake.

No one can predicate a mistake on his own negligent omission to perform a legal duty. . . . When one is charged with a duty, and forgets to do it, it may under certain circumstances constitute excusable negligence, but it cannot be held to be a mistake. . . . Negligently and inadvertently omitting to perform a duty is far different than to omit it through mistake or accident.

*SDG Macerich Props.*, 648 N.W.2d at 587 (internal quotation marks and citations omitted). This definition comports with our recently decided opinion in *Lovato v. Crawford & Co.*, 2003–NMCA–088, ¶ 25, 134 N.M. 108, 73 P.3d 246 (distinguishing excusable neglect from carelessness or inattention). *See also Duncan*, 526 A.2d at 1365 (distinguishing honest mistake from mere neglect); *Crown Constr. Co. v. Huddleston*, 961 S.W.2d 552, 559 (Tex.Ct.App.1997) (holding that a honest and justifiable mistake was not present when a tenant was aware of the option deadline and method by which the option was to be exercised and utilized another method).

## CONCLUSION

{31} The *SDG Macerich Properties* opinion began with the familiar maxim that "[e]quity aids the vigilant." 648 N.W.2d at 583. We recently expressed the same sentiment in *Juarez v. Nelson*, 2003–NMCA–011, ¶ 22, 133 N.M. 168, 61 P.3d 877. *See also Thompson v. Montgomery & Andrews, P.A.*, 112 N.M. 463, 467, 816 P.2d 532, 536 (Ct.App.1991) (stating that equity aids the vigilant, not those who slumber on their rights). This case arose simply because Tenant was not vigilant. We wholeheartedly agree with the conclusions expressed by the *SDG Macerich Properties* court:

We will not use equitable principles to save a party from the circumstances it created.

[Tenant] would have us weigh the equities of each particular case to achieve the most "just" result. However, the decision of which of two profit-seeking parties is more deserving to prevail is not within the province of the courts. [Tenant] has not offered and we have found no justiciable standards announced in other jurisdictions to assist this court in making such an arbitrary decision. No one factor to be considered in such an equitable analysis is sufficiently compelling to require us to aid [Tenant] or any other party where the parties bargained freely to their contract.

To hold otherwise would do nothing more than create instability in business transactions and disregard commercial realities. . . . Were we to accept [Tenant]'s argument, "all contracts would be called into question as meaningless and uncertain, dependent upon the whims of a panacean court or a jury." Attempting in vain to balance the equities, especially in a situation where as here the record is devoid of any so-called "equities," will weaken the sanctity and predictability of the written word.

The written words of the contract afford greater certainty of intention, and more accurate compliance with the performance of the terms of the contracts by the parties thereto than do the retrospective, impassive conclusions of a court of equity. A court of equity should not be the first, but the last resort. It is bound by a contract as the parties have made it and has no authority to substitute for it another and different agreement, and should afford relief only where obviously there is fraud, real hardship, oppression, mistake, unconscionable results, and the other grounds of righteousness, justice and morality.

In sum, application of the *Fountain* rule would result in granting relief for failure to comply with an option provision anytime the "delay is slight, the lessor's loss is small, and the lessee would suffer a hardship." Such a rule would excuse failure to comply with the lease in most cases. This result is directly contrary to our estab-

lished precedent enforcing strict adherence to contractual time limitations.

*SDG Macerich Props.,* 648 N.W.2d at 587–88 (citations omitted).

{32} In summary, we hold that, under the circumstances of this case in which the notice was quite late when measured against the notice period provided in the lease and when the reason for the late notice is simple neglect, a court may not relieve a party of the bargain it made and must enforce the lease as it was written. Accordingly, the trial court erred in awarding summary judgment to Tenant. The judgment of the district court is reversed.

{33} **IT IS SO ORDERED.**

I CONCUR: CYNTHIA A. FRY, Judge.

CELIA FOY CASTILLO, Judge (Dissenting).

CASTILLO, Judge (dissenting).

{34} While I agree with the majority that our task in this case is to decide which line of cases best reflect the law and policy of New Mexico, I respectfully dissent. I believe that equity should be allowed to intervene because this case involves a possible forfeiture. The majority opinion decides as a matter of law that equity cannot be considered in cases where a tenant forgets to timely send a notice of lease renewal. This holding is based on three points: (1) courts may not rewrite obligations that the parties bargain for themselves; (2) in the absence of well-defined equitable exceptions, equity should not intervene; and (3) instability and uncertainty would ensue if we adopted the *Fountain* rule. There is New Mexico law to support these general propositions, but not in cases such as this where forfeiture is a possible result. New Mexico law is clear: equity abhors forfeiture. *Stamm,* 55 N.M. at 132, 227 P.2d at 636.

{35} As early as 1922 our Supreme Court, in recognizing the harshness of forfeiture, held that equity could intervene to relieve a tenant of commercial property from "forfeiting" the lease simply because the tenant was late in paying one month's rent. *N.M. Motor Corp.,* 27 N.M. at 307, 201 P. at 106. The Court in *N.M. Motor Corp.* allowed equity to intervene in this commercial lease situation to prevent a forfeiture *even in the absence of fraud, accident, or mistake. Id.* "[Equity] looks to the substance rather than the form. It will not sanction an unconscionable result merely because it may have been brought about by means which simulate legality." *Ortiz v. Lane,* 92 N.M. 513, 519, 590 P.2d 1168, 1174 (Ct.App.1979) (Hernandez, J., specially concurring) (quoting from *Merrick v. Stephens,* 337 S.W.2d 713, 719 (Mo.Ct.App. 1960) (emphasis and internal quotation marks omitted)). This case should not turn on attempts to characterize the failure to give timely notice, but rather on the consequences to both parties that flow from the untimely notice.

{36} In *Nearburg,* the Court described forfeiture as follows:

> The Restatement uses the term forfeiture to mean the denial of compensation to an obligee because of the non-occurrence of a condition after the obligee has relied substantially on the expectation of the bargained-for exchange, either by preparation or performance. [Restatement (Second) of Contracts § 227 cmt. b (1981)]. "When it is said that courts do not favor forfeitures, the meaning is that they do not like to see a party to a contract getting something for nothing." 3A Arthur Linton Corbin, *Corbin on Contracts* § 748, at 465 (1960).

1997–NMCA–069, ¶ 21, 123 N.M. 526, 943 P.2d 560. In *Nearburg,* we held there was no forfeiture. *Id.* Unlike the purchase option cases cited by the majority, this case deals with a notice to renew a long term lease on premises developed at substantial cost to Tenant. In this case, Landlord will receive a fully developed piece of property having paid little or nothing for the development. While we recognize that Tenant has received rents in excess of what is paid to Landlord, the difference is used to recoup the investment. If the lease is terminated now, Landlord is entitled to that rental income, or it may relet the premises at a higher rate, all without having any substantial investment in the development of the property. This is "getting something for nothing," and is exactly the

type of situation that requires at least the consideration of equity.

{37} Citing to *Bishop*, 67 N.M. at 342, 355 P.2d at 279, the majority points to the reasoning behind allowing equity to apply to real estate contracts, which is that the buyer has an equitable right to the land and that this type of financing is a special device that allows many people to become property owners with very small down payments and long payment periods in a manner likened to rent. The majority believes that the possible uncertainty in outcome by allowing equity to intervene when late notice is made in commercial lease cases would have a negative impact on the conduct of business in New Mexico. A review of real estate contract cases reveals that not all buyers are individuals; on the contrary, real estate contracts are used in commercial dealings. *See, e.g., Albuquerque Nat'l Bank v. Albuquerque Ranch Estates, Inc.*, 99 N.M. 95, 654 P.2d 548 (1982). Further, I believe we must look to the underlying policy in the real estate contract cases, that is, equity abhors forfeiture, and allow the district court to make a decision under the existing facts of the case. *See id.* at 102, 654 P.2d at 555. Again, each case turns on its own facts, and a trial court weighs the many factors in deciding when and how equity should intervene. In allowing equitable principles to determine whether a forfeiture can be declared by a vendor against a sub-vendee without notice, our Supreme Court summarized New Mexico law as follows:

the modern view that valuable contractual rights should not be surrendered or forfeitures suffered by a slight delay in performance unless such intention clearly appears from the contract or where specific enforcement [upon the seller] will work injustice after a delayed tender. As we observed in *Martinez* [*v. Martinez*, 101 N.M. 88, 92, 678 P.2d 1163, 1167 (1984)], the courts' disapproval of forfeitures is long-standing; we are not compelled in every case to enforce a real estate contract when fairness and legal principles dictate that we should not. A forfeiture declaration is essentially an equitable remedy. It therefore makes perfectly good sense to apply equitable principles in determining wheth-

er a vendor under an installment land sale contract will be permitted to declare a forfeiture.

*Yu v. Paperchase P'ship*, 114 N.M. 635, 644, 845 P.2d 158, 166 (1992) (internal citations and quotation marks omitted). Absolutely forbidding equity to be considered in this case is contrary to the spirit of New Mexico law.

{38} I disagree that application of the factors in *Fountain* or its progeny will introduce excessive instability or insecurity into commercial transactions. This type of arrangement or series of transactions has become increasingly common as a method of developing commercial property. *See generally* Whalen, supra §§ 1.1 to 1.8; 2 Friedman, supra Ch. 14. The holding in *Fountain* is more consistent with commercial realities and will provide increased stability for those who wish to develop commercial property, with no unexpected losses to the owners of the land on which the development takes place. Normally, when leased premises have been developed and are sublet, landlords expect the lease to be renewed. In those cases, the failure to tender a timely notice is unexpected and in some cases a surprise. It may also result in a windfall for the landlord.

{39} In this case, Tenant asked for an equitable remedy, which was to require Landlord to treat the untimely notice as effective. Landlord did not want the district court to take equity into account. Landlord's attorney argued to the district court that "one way or another someone is going to get the short end of the stick, whether it is [Landlord] or [Tenant], that's the reality."

{40} It is clear from the record that the district court did in fact consider all the equities as set out in *Fountain* before granting relief and that the equities were heavily in favor of Tenant in this case. First, it was undisputed that Tenant did not intentionally fail to give timely notice. Second, while the notice of a desire to extend the lease was not given in a timely fashion, it was still given, and indeed suit was filed, before that term of the lease expired. The majority points to the difficulty in applying a rule involving "slight" delay. According to *Fountain*, the delay is

measured against the notice. In this case, the tenant was late about forty days out of the ninety-day notice period. The majority is concerned that because the word "slight" is open to interpretation, the parties have nothing concrete to rely on. Each case turns on its own facts. I believe a district court is certainly capable of evaluating the delay as it did in this case. I cannot say that the district court was wrong in considering this particular delay slight, especially when balanced with the other factors.

{41} Third, the district court considered the substantial hardship to Tenant which in this case is tantamount to forfeiture. Even the majority recognizes the $2,000,000 investment made by Tenant but expresses its concern about the value of the recoupment and difficulty in following known standards. Again, each case turns on its particular facts and I believe that district courts are capable of sorting it all out.

{42} Fourth, the district court considered the extent to which Landlord's interests would be prejudiced by granting the requested relief. In the district court, it was undisputed that Landlord had not changed its position in reliance on the failure to give timely notice. Indeed, the only prejudice to its interests that Landlord could point to was the fact that it would continue to receive rent at a rate set in the 1960s and substantially below what the market would bear today. This, however, is the result of the rental rate and the number of extensions allowed under the lease and has nothing to do with the timeliness or untimeliness of the notice of intent to renew for an additional term.

{43} Lastly, the district court also considered the interests of possible third parties. It was undisputed below that Landlord had not looked for or found a new tenant, nor had Landlord listed the property for sale, so its interests did not implicate those of any third parties or owner whose interests had to be considered. On the other hand, it was equally undisputed that the interests of the Subtenants would also have been significantly harmed if relief was not granted. In short, this was a case in which the equities favored giving relief.

{44} In summary, I believe New Mexico law should allow the exercise of equitable powers and require a Landlord to treat as timely an untimely notice of intent to extend a long term lease for another term of years if, as is true here, the delay in giving notice is not willful or deliberate, the length of the delay is relatively short, the notice of intent to extend is given before the term of the lease expires, and the hardship to the tenant in denying relief clearly outweighs any hardship that will be incurred by the landlord if relief is granted.

{45} For the above reasons, I respectfully dissent.